THE CITY OF INDIANOLA v. GULF, WESTERN TEXAS & PACIFIC RAILWAY.

(Case No. 144.)

1. POWER OF CITY TO CONTRACT AS TO RIGHT OF WAY — ULTRA VIRES NO DEFENSE, WHEN — STIPULATED DAMAGES.— A railway company made application for the right of way through certain streets of a town, which was refused, and afterwards obtained permission to go through the same streets, by agreeing to extend the road a certain distance beyond the town, and executed a bond in the sum of $50,000, as stipulated damages, conditioned for the faithful performance of their agreement.   Under the statute in force at the time, the railroad company could have made application to the state engineer, and he could have designated a route through the town, not to interfere with the commercial interest or convenience thereof.   The railroad company failed to perform its part of the contract and the city brought suit on the bond.   *Held,*

(1) That the consideration paid and furnished by the city was not

illegal, and the city authorities had power over the subject matter of the contract.

(2) The contract was not *ultra vires* as to the railroad company, the power to contract for the right of way being one of the necessary incidents to carry out the purposes of the charter. If the contract were *ultra vires*, such defense could not be set up when the railroad was already in the enjoyment of the fruits of it. The city had power to make such a contract.

(3) That the amount named in the bond was stipulated damages, recoverable as such, and not a penalty; the damage from failure to perform the contract being incapable of accurate computation, and the amount having been agreed upon by both parties with a full knowledge of all the facts.

APPEAL from Calhoun. Tried below before the Hon. T. C. Barden.

The city of Indianola brought this suit June 28, 1872, against the Gulf, Western Texas & Pacific Railway to recover upon a bond for $50,000 and interest. The substance of the case made by the petition was that the city of Indianola is an incorporated city; that the Indianola Railroad Company was incorporated by special act of the legislature, with its principal office at Indianola; that on the 4th day of August, 1870, the same was consolidated with the "San Antonio & Mexican Gulf Railroad Company," under the name and style of "The Gulf, Western Texas & Pacific Railway Company," by special act of the legislature, passed the 4th day of August, 1870; and contract made in pursuance of the same; the Indianola R. R. Co. was created by act of the legislature approved January 21, A. D. 1858, and the San Antonio & Mexican Gulf Railroad Company was created by act approved September 5, 1850. That said companies were authorized by their charters to construct a railroad from the mouth of Powderhorn Bayou on Matagorda Bay, and from the town of Lavaca to the cities of Austin and San Antonio; and by the act of consolidation the Gulf, Western Texas & Pacific R. R. Co. was authorized to construct such railroads.

The 11th day of April, 1870, the Indianola R. R. Co. applied to the city authorities for the right of way over certain of the streets and alleys of the city, which was refused, on the ground that the construction of the road on the line designated would be detrimental to the interest of the city, etc., unless the road should be speedily extended at least sixty-five miles into the interior. June 20, 1870, the city council passed a resolution granting to the company the right of way on the desired line, upon conditions set forth therein, amongst others, that said company should execute a bond in the sum of $50,000, conditioned that the company would construct and complete, alone or in conjunction with other companies, a continuous line of railroad from Indianola to the town of Victoria, and to a point twenty-five miles beyond, within twenty-two months from July 1, 1870. On June 21, 1870, the board of directors of the company passed a resolution accepting the grant of the right of way on the conditions mentioned, and authorized the president thereof to receive a deed from the city, and to execute and deliver the required bond. The deed was made, executed and delivered by the city the same day, and the same day the company, through its president, made, executed and delivered the bond.

It was alleged that said company was afterwards consolidated as above stated, and that the company had failed to construct and complete the railroad to the point designated within the time therein named, but that it had failed and refused to comply in this particular with the terms of said bond. That the said company had constructed the road through the city of Indianola, along the streets and alleys designated in said deed, and was then continuously occupying the same with its cars, to the great disadvantage, inconvenience and damage of the city. The prayer was for a judgment for the $50,000, as stipulated damages, with interest.

The defendants filed a general and special exception; amongst others, upon the following grounds:

1st. That it appears from the petition and exhibits that the consideration for the contract sued on is illegal, for that the company had the right to the use of the streets, without paying any compensation therefor, and the city had no power over the subject matter of the contract.

2d. That the contract was *ultra vires*, both as to the railway company and the city.

3d. That the amount named in the contract or bond is a penalty and not stipulated damages.

The cause came on for trial October 3, 1873, when the court sustained the company's demurrer to the city's petition, and rendered judgment that the railway company go hence without day; also that the city of Indianola pay costs, etc. From that judgment this appeal was taken, and errors assigned as follows:

1st. The court erred in sustaining the defendant's general special demurrer to plaintiff's petition.

2d. The court erred in dismissing the above entitled suit upon demurrer.

*Philips, Lackey & Stayton,* for appellant.

*Stockdale & Proctor,* for appellee.

I. The contracts of railway companies, like those of individuals, to be valid, require the essentials of a legal contract, to wit, the existence, capacity and assent of the parties; a lawful and valid consideration and a lawful subject matter. Pierce's R. R. Law, 359.

(1) The consideration of the bond sued on was unlawful. By the charter of the company, the Indianola R. R. commenced on Matagorda Bay, at or near the mouth of

[1] In compliance with a rule which excludes extended notice of briefs of the successful party, the brief of appellant's counsel is omitted; this is regretted, on account of its exhaustive discussion of the authorities on the points involved.

Powderhorn Bayou, and was compelled to pass through the city. Special Laws 1857–58, p. 56, sec. 6. The right to pass through and over streets and highways is a statutory right granted by the state. Pasch. Dig., art. 4936 *et seq.* The city had no power over the subject, except to agree with the company as to the route. This it was bound to do, and was prohibited from obstructing the connection under large penalties. So the consideration was clearly unlawful, and most clearly not valid. The performance of that which the party was previously under obligations to do is no consideration. If any part of the consideration is illegal, the whole is void. 1 Pars. on Con., 437, 457–60.

(2) In this case the city had no power to grant the right of way; it did not own the fee in the streets and alleys, and the right had already been granted by the state; the only function of the city was to adjust with the company the route. Cooley's Const. Lim., 207, 545, 549; Dillon on Mun. Corp., secs. 513, 555–56; id., secs. 519, 524, 541, 575 *et seq.;* Redfield on Railways, sec. 76 and note.

II. The bond sued on in this case is, as to both contracting parties, *ultra vires* and void. Redfield's Am. Railway Cases, 458–60; Dodge *v.* Woolsey, 18 How., 331; Bank of Augusta *v.* Earle, 13 Pet., 587.

(1) Municipal corporations cannot bind themselves beyond the scope of their powers. Dillon, secs. 55, 374; 376; Cooley, 194 *et seq.;* id., 211; Kerr, 572.

(2) The same rule applies to railways and other private corporations. Pierce, 359, 395–6, 452; Cooley, 394–6; Penn. R. R. Co. *v.* Canal Com'rs, 21 Penn., 22; The Binghamton Bridge, 3 Wall., 51; Perrin *v.* Canal Co., 9 How., 172; Rich. R. R. *v.* Louisa R. R., 13 How., 71; Rice *v.* Railroad, 1 Black, 358, 436; Beaty *v.* Lessee of Knowles, 4 Pet., 152, 168, 171; Sedgwick's Stat. and Const. Law, 439; Kerr on Inj., 558 *et seq.;* Redfield on Railways, 437, 655.

WATTS, J. COM. APP.— All the questions presented by the record arise out of sustaining the railway company's general and special exceptions to the city's petition. These questions may be stated and considered in the following order:

*First.* It is claimed that the consideration for the contract sued on is illegal, for that the railway company had the right, under the law, to occupy the streets and alleys of the city as a road-bed, without paying any compensation therefor, and that the city had no power over the subject matter.

*Second.* That the contract was *ultra vires,* both as to the railway company and the city.

*Third.* That the amount named in the contract is a penalty, and not stipulated damages.

Preliminary to the consideration of these questions, it may be assumed as settled law that the consolidation of the "Indianola Railroad Company" with the "San Antonio & Mexican Gulf Railroad Company," under the name and style of "The Gulf, Western Texas & Pacific Railway Company," by virtue of an act of the legislature, passed the 4th day of August, 1870, renders the consolidated company liable for all the valid contracts and liabilities of the two companies thus consolidated. Stephenson *v.* T. & P. R. R. Co., 42 Tex., 166; T. & P. R. W. Co. *v.* Murphy, 46 Tex., 360.

Was the purported consideration for the contract bond paid or furnished by the city of Indianola illegal?

Our statute then in force was, in effect, that any railway company chartered by the laws of this state had the right to construct the main track of the road through the corporate limits of any city or town on the line of the road, and for that purpose might use any of the public streets or alleys, without paying any compensation therefor. And in the event the people or authorities of such city or town should oppose the passage of any road

through or over any particular street or highway, that the state engineer, or such person as the governor might appoint, on the application of either the company or the city or town, should designate the streets, alleys and highways through and over which such road should pass. And that in the selection of streets or highways, a due regard should be had to the commercial interests and convenience of the city or town, and that no main business street or highway should be appropriated for a railway track if another might conveniently be made to answer. Pasch. Dig., arts. 4936, 4937, 4941.

Prior to the execution of the contract under consideration, the railway company applied to the city authorities for permission to occupy certain streets and alleys as a road-bed; this application was refused. When this was done the company could, under the statute, have called upon the state engineer to designate the streets and alleys over which the road could pass, and after such designation it could have constructed and maintained its road in accordance therewith, without having to pay any compensation to the city for the use of such streets and alleys.

It will be observed that the statute does not give the company the right to occupy such streets and alleys as it may select, in opposition to the will of the authorities of the town or city; but, on the contrary, due regard in this particular must be had to the commercial interests and convenience of the city or town; and when called in either by the company or city or town, the state engineer is required to observe that rule, and also not to designate any main business street for the purpose if another could be conveniently made to answer. Now, while the company had the right to pass through the city, and occupy with its road the streets and alleys necessary to that end, without paying compensation, it did not have the absolute right to occupy such streets and alleys as it

might select, regardless of the commercial interests of the city and against the will of these authorities.

Upon the refusal of the city authorities, the railway company had the right to call in the state engineer to designate the route through the city; but in doing this, it would have no assurance that the line selected, and which it is presumed was most desirable to the company, would be designated by the state engineer. In this dilemma the company preferred to settle the matter by agreement and compromise with the city, rather than risk a designation by the state engineer; that is, the company chose to pay the city for the right of way on the line desired, rather than accept that which might be designated by the state engineer, without compensation having to be made.

There is nothing in the law that would prevent the company from making such contracts with respect to its right of way upon the one hand, or the city, upon the other, from contracting with regard to its streets and alleys to be used as a road-bed. It is plainly inferable from the provisions of the statute cited above, that railroad companies and the cities or towns could settle such matters by agreement between themselves; and instead of being prohibited, it appears to us that such agreements are authorized by the spirit of the law.

It does not follow from the fact that the company might occupy with its road some of the streets and alleys of the city without compensation, that the city could not refuse to allow the use of such of its streets as would be injurious to its commerce and inconvenient to its citizens. The city authorities control the streets for the benefit and convenience of the citizens, and have no power to sell and convey the same; yet there is no principle of law that would preclude them from consenting to an easement therein, for a railroad company to use the same for a road-bed. And the use in this way of some

of the streets of the city might be detrimental to its commerce and inconvenient to the citizens; hence we see no reason why these authorities might not contract for a compensation inuring alike to all of its citizens, for submitting to such injuries and disadvantages. Surely after the company has received and is in the enjoyment of the fruits arising from such a contract, it will not be heard to complain, and assert that the city could not confer upon it the right that it had thus received and is now enjoying.

We conclude that the consideration paid and furnished by the city of Indianola for the contract sued on is not illegal, and that the city authorities had power over the subject matter of the contract.

Appellee claims that the railroad company had no power to make the contract sued on. Upon this point Mr. Pierce, in his work on Railroads, pages 499, 500 and 501, uses this language: "Corporations have an implied power to make such contracts as are usual and necessary for carrying into effect the purposes for which they were created. A railroad corporation is usually authorized to make contracts by an express provision of statute; but, in the absence of such a provision, the power is necessary and incidental to the express power to locate, construct, maintain and work a railroad. The power, whether express or implied, must, in view of the purposes and methods of such an enterprise, be allowed a liberal scope," etc.

"The power of a corporation, in respect to contracts and business dealings, extends not merely to those which are absolutely essential or indispensable to the performance of the specified acts authorized by its charter, but as well to those which, not being prohibited by statute or public policy, are designed and may be useful to promote the main enterprise. The choice of means which are reasonably promotive of the main purpose is with the

corporation; and where different methods stand this test, judicial tribunals will not revise its discretion by holding that the one chosen was not indispensable, and that another might have been more wisely taken," etc.

"The contracts of a corporation are presumed to be within its power, and the burden of showing its incapacity by the terms of the charter is on the party who denies their validity." .

These principles with respect to the question of *ultra vires* have been deduced by Mr. Pierce from a review of all the leading cases, both English and American, and may be considered as the settled rules to be applied to the question.

An examination of Green's Brice's *Ultra Vires*, from page 28 to 43, fully sustains the conclusions of Mr. Pierce quoted above; while the English cases, and especially those decided by the house of lords, go still further, and in my opinion place the whole matter upon a more reasonable and satisfactory basis. In Eastern Counties Railway v. Hawkes, Lord St. Leonard said: "I trust that this decision, and the decisions of this house during the present session in the cases of National Exchange Co. v. Drew, and in Bargate v. Shortridge, will place the powers and liabilities of directors and their companies in making contracts, and in dealing with third parties, upon a safe and rational footing. They do not authorize directors to bind their companies by contracts foreign to the purposes for which they were established, but they do hold companies bound by contracts duly entered into by their directors, for purposes which they have treated as within the objects of their acts, and which cannot be clearly shown not to fall within them; and they further hold companies to be bound by a continued course of dealing by their directors with third persons in relation to their shares, although that mode of dealing is contrary to the regulations of their deed of management. I hope

that we shall have no other cases before us where the defense of a company rests upon the want of power to make a contract which the directors deliberately entered into, and under which they took a benefit, or upon the irregularities of their own proceedings."

In the case before us, the power to contract with respect to the right of way, by the company, must be considered as essential to the construction and operation of the road. It would be worse than folly for the legislature to grant the company the right to construct and maintain a railroad, and at the same time throw about it such legal restrictions as would prevent it from securing the right of way by contract upon which to construct the road. That the directors of the company had the power to contract with respect to the right of way is obvious. When the city refused to permit the company to occupy with the road-bed such streets and alleys as it had selected, then the directors had the choice either to call in the state engineer and construct the road upon the line designated by him, or to secure that of its choice by contract or agreement from the city. Having adopted the latter course, this court will not undertake to revise the discretion of the directors in this regard, even though it should appear, as it does not in this case, that the other course might have been more wisely taken by them. Baltimore v. Baltimore & Ohio R. R. Co., 21 Md., 50, 92; Curtis v. Leavitt, 15 N. Y., 9-65; Madison, W. & M. Plank Road Co. v. Watertown & P. Plank Road Co., 5 Wis., 173; Norwich v. Norfolk R. Co., 4 El. & Bl., 397.

This defense of the company, that its directors had no authority to make the contract, when the desired right of way had been secured by it, and the company had been for years and was still in the enjoyment of the same, to say the least of it, is an exceedingly narrow defense, shorn of all equity, and is entitled to no favorable consideration.

We conclude that the contract under consideration is not *ultra vires* as to the railroad company.

As before remarked, it is inferable from our statute that the city of Indianola had the right and power to contract with the railroad company in regard to the particular streets to be occupied by the road. These streets are public property, and notwithstanding the powers conferred by the legislature upon the city authorities with respect to them, they remain public and subject to legislative control. The legislature might authorize their use by railroads as a road-bed, without compensation to the city. People *v.* Kerr, 27 N. Y., 188; *In re* Boston & Albany R. R. Co., 53 N. Y., 574; City of Clinton *v.* Cedar Rapids & Mo. R. R. R. Co., 24 Iowa, 455.

But it must be remembered that in this particular our legislature did not give the railroad company the right to use without compensation any street it might select; on the contrary, the use in this way of the main business streets is not ordinarily permitted, if objected to by the city authorities. Here these authorities had objected to the streets selected by the company, and that they could waive or withdraw that objection admits of no doubt. And it seems to us equally as clear, that in yielding or withdrawing their objections to the use of the particular streets by the company, that as a consideration for the disadvantages resulting therefrom, they could contract for compensatory advantages to the city in the early extension of the road into the interior. With reference to this contract, the city authorities yielded nothing but that which they had the right to yield; no debt was created upon the part of the city that would necessitate the levy of a tax to pay; by the contract the city had yielded an advantage in regard to the use of the streets, and this was done in consideration of the advantages to accrue to the city by the correlative promise upon the part of the company to extend the road into the interior a given distance by the time named.

We do not think that this contract is illegal for the want of power in the city authorities to make the same.

This brings us to the consideration of the only remaining question presented by the record, to wit: Is the amount named in the bond, or contract sued on, stipulated damages or a penalty? Here judicial decisions as well as text-writers have taken a wide range, resulting in considerable confusion and doubt. We deem it altogether unnecessary to enter upon an extended discussion of the subject, or to attempt to reconcile seemingly irreconcilable decisions, upon points incidental to the main question, as we are of the opinion that a proper application of a few plain and well settled principles of construction will be determinative of the question presented by the record.

The authorities generally concur that in construing this class of contracts, as well as all others, the courts are governed by the intention of the parties; such intentions generally to be arrived at by a consideration of the language employed and the subject matter of the contract. Sedgwick on the Measure of Damages, 419; Field on Damages, § 136.

The following quotation from the work of Mr. Field is given because it seems to us the rules and principles therein announced are supported by the general current of authority:

Rule 9, page 29. "Where the parties have stipulated as to the amount of damages, that will ordinarily fix the amount recoverable, whether the actual damages be greater or less than the amount thus fixed."

§ 134. "It is not unusual for the parties to a contract to stipulate therein in reference to the amount of damages in case of a breach thereof. The sum thus fixed upon is generally called liquidated damages. The right of parties to thus stipulate is unquestionable. In many cases it is the only practicable way of obtaining redress in case of a breach. Public policy and private interests

may be thereby promoted. And when such a contract is fairly made, and for the legitimate purpose of determining the damages, either for a breach of the whole or any particular provision of the contract, the amount thus fixed will control and limit the damages recoverable, whether the actual damages be greater or less than the sum stipulated."

§ 155. "The sum expressed will be treated as liquidated damages: 1. When the agreement is in the alternative to do some particular thing or pay a particular sum of money, unless it shall appear unconscionable. 2. When the actual damages will be difficult or impossible of ascertainment; especially where the sum is not so unreasonably large as to induce the presumption that the parties did not contemplate its payment."

That part of the bond out of which the question directly arises is in the following language:

"Now, therefore, if said line of railway, sixty-five miles long, running from said city of Indianola through the town of Victoria, and to a point twenty-five miles beyond, shall be constructed as aforesaid within the time aforesaid, then this obligation to be void and of no effect; otherwise to remain in full force, and be binding on said company for the full sum of fifty thousand dollars aforesaid, as stipulated damages."

Looking to the substance of this contract without regard to its form, and it appears to us to be an alternative agreement, that in consideration for the consent of the city to the occupancy of its main business streets by the road, that the company bound itself to construct the road as named, or in the alternative to pay the city the said sum of $50,000.

Conceding, however, that such is not the case, then it is true that the actual damages resulting from a breach of the contract by the company would be almost, if not quite, impossible of ascertainment. For who could say

what damages resulted to the city by the continued use of its business streets by the cars of the company? Who could determine with any certainty the advantage resulting to the company from such continued use of these streets? Or who could estimate the amount of damages sustained by the city from a failure upon the part of the company to construct the road according to the agreement? Such damages from either cause might be immeasurably greater than the sum named in the contract, or it might be less. Nor can it be said that the sum named as "stipulated damages" is so unreasonably large as to induce the belief that its payment was not contemplated by the parties; and considering the advantages that may and likely have resulted to the company by virtue of this contract, the amount named does not appear to be unconscionably large.

The parties designated the amount as "stipulated damages," and the company agreed that, upon failure to construct the road, it stood bound to the city for the full sum of $50,000 aforesaid. And in the resolution framed by the board of aldermen authorizing the mayor to make the grant, it is stated that the sum of $50,000, the amount of the bond, is to be paid in the event the company failed to construct the road as therein mentioned.

In the case of Dakin v. Williams, 19 Wend., 447, Chief Justice Nelson said: "From a critical examination of all these cases, and others that might be referred to, it will be found that the business of the court, in construing this clause of the agreement, as in respect to every other clause thereof, is to inquire after the meaning and intent of the parties; and when that is clearly ascertained from the terms and language used, it must be carried into effect," etc.

"Men may enter into improvident contracts when the advantage is knowingly and strikingly against them; they may also expend their property upon idle or worth-

less objects, or give it away, if they please, without an equivalent, in spite of the powers or interference of the court; and it is difficult to see why they may not fix for themselves by agreement in advance a measure of compensation, however extravagant it may be, for a violation of their covenant, without the intervention of a court or jury. Can it be an exception to their power to bind themselves by lawful contract ? We suppose not," etc.

"If it be said that the measure is a hard one, it may be replied that the defendants should not have stipulated for it, or having been thus indiscreet, they should have sought the only exemption which was still within their power, namely the faithful fulfillment of their agreement."

Acting upon the well settled rules of construction hereinbefore noticed, we have no hesitation in holding that the amount named in the bond is stipulated damages, and recoverable as such, taking the allegations of the petition as true.

We conclude that the general and special exceptions to appellant's petition were erroneously sustained by the court, and that the judgment ought to be reversed and the cause remanded.

REVERSED AND REMANDED.

[Opinion delivered March 7, 1882.]

NOTE.—Judge STAYTON did not sit in this case.