DA MOTH & ROSE et al. v. HILLSBORO INDEPENDENT SCHOOL DIST. et al. (No. 7449.)*

(Court of Civil Appeals of Texas. Dallas. April 8, 1916. On Rehearing, May 27, 1916.)

1. CONTINUANCE ☞14(4) — AMENDMENT OF PLEADINGS.

No new cause of action being set up, and there being no cause for surprise, there was no abuse of discretion in not granting a continuance, where the petition, in an action against a building contractor for defective work, whereby part of the building fell, estimated the damages at $30,000, and the amendment alleged that the building had been reconstructed by plaintiff, and placed the damages at $39,000.

[Ed. Note.—For other cases, see Continuance, Cent. Dig. § 103; Dec. Dig. ☞14(4).]

2. PLEADING ☞356(1)—AMENDMENT—STRIKING OUT.

There is no error in not striking out an amendment of a petition, stating definitely the damages at a higher figure than estimated in the petition, no new cause of action being set up, and there being no cause for surprise.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 1111, 1112, 1114–1116, 1119; Dec. Dig. ☞356(1).]

3. CONTRACTS ☞302—BUILDINGS—FALL BEFORE COMPLETION—LIABILITY FOR LOSS.

Where without wrong of the owners a building falls before the contractor has completed it, he is liable to them for the damages for his failure to reconstruct.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1401–1408; Dec. Dig. ☞302.]

4. PRINCIPAL AND SURETY ☞100(3)—CHANGES—DISCHARGE OF SURETY.

As regards liability of a building contractor's surety, it is immaterial that there were changes from the original plans, where the contract was for construction according to the changed plans.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. § 163; Dec. Dig. ☞100(3).]

5. PRINCIPAL AND SURETY ☞100(3)—CHANGES—DISCHARGE OF SURETY.

A change in ornamentation, not affecting cost or strength, is immaterial, and will not discharge a building contractor's surety.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. § 163; Dec. Dig. ☞100(3).]

6. PRINCIPAL AND SURETY ☞117—CONTRACTOR'S BOND—PAYMENT ON CONTRACT.

The surety on a contractor's bond is not discharged because 20 per cent. is not at all times retained, as provided by the contract, where the owner not only pays in good faith on the architect's certificates, but in the end 20 per cent. is retained.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 283–285; Dec. Dig. ☞117.]

7. PRINCIPAL AND SURETY ☞123(2)—NOTICE TO SURETY OF DEFAULT—PROVISION OF BOND.

Provision of a building contractor's bond for notice to the surety of default of the contractor within 30 days after knowledge thereof is not breached where notice is given immediately after the owner learned of the default, though more than 30 days after the default.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. § 310; Dec. Dig. ☞123(2).]

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Application for writ of error pending in Supreme Court.

8. DEPOSITIONS    ⟨≈⟩83(3) — SUPPRESSION — GROUNDS.

It is not ground for suppressing a deposition that the attorney of the party taking them before doing so merely submitted to the witness certain private interrogatories and had him put his answers in writing.

[Ed. Note.—For other cases, see Depositions, Cent. Dig. § 221; Dec. Dig. ⟨≈⟩83(3).]

9. DEPOSITIONS    ⟨≈⟩83(3) — SUPPRESSION — GROUNDS.

Failure of witness to answer a cross-interrogatory is ground for suppressing the deposition if the question is important.

[Ed. Note.—For other cases, see Depositions, Cent. Dig. § 221; Dec. Dig. ⟨≈⟩83(3).]

10. DEPOSITIONS    ⟨≈⟩65—CROSS-INTERROGATORY.

It is not ground for objection to a cross-interrogatory, eliciting an opinion, that it did not state sufficient facts on which to base an opinion; all the facts having been stated and the witness qualified in the direct interrogatories.

[Ed. Note.—For other cases, see Depositions, Cent. Dig. §§ 142–145; Dec. Dig. ⟨≈⟩65.]

11. EVIDENCE    ⟨≈⟩472(11)—OPINIONS—ULTIMATE FACTS IN ISSUE.

Opinion of witness on the ultimate issue for the jury, the cause of the fall of a building, is improper.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2195; Dec. Dig. ⟨≈⟩472(11).]

12. APPEAL AND ERROR ⟨≈⟩302(1)—REVIEW—MOTION FOR NEW TRIAL—CLERICAL ERROR.

Consideration of assignment of error to refusal to strike answer to interrogatory 11 should not be refused on the ground that this was not called to the court's attention in the motion for new trial, because in such motion it is mentioned as "interrogatory No. 10, as her bill of exceptions No. 51," such bill showing it to be interrogatory 11, and calling it "11" being clearly a clerical error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1744–1746; Dec. Dig. ⟨≈⟩302(1).]

13. TRIAL ⟨≈⟩85—RECEPTION OF EVIDENCE — OBJECTION TO WHOLE ANSWER.

Though usually objection to the whole answer, when part of it is competent, is insufficient, it is enough where the opinion of a witness as an expert was sought, and it was necessary for him to state the facts he did to show his qualification, and this was so interwoven and connected with his objectionable opinion that it is difficult to separate the material from the immaterial.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 222, 223–225; Dec. Dig. ⟨≈⟩85.]

On Rehearing.

14. CONTRACTS ⟨≈⟩302—BUILDING CONTRACTOR AND MATERIALMAN.

Under the contract of materialmen with a building contractor, providing that, "where general information and drawing are furnished for the proper placing of our products in the structure, it is understood that these drawings are furnished gratis and form no part of this contract, other than that they specify the amount of material contemplated in the order, the drawings must not be used before being rechecked by the purchaser, or his architect, and the purchaser alone shall be responsible for the correctness of said drawings," the materialmen are not liable to the contractor for defects in the building through any defects in the drawings.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1401–1408; Dec. Dig. ⟨≈⟩302.]

Error from District Court, Hill County; Tom L. McCullough, Judge.

Action by the Hillsboro Independent School District and others against Da Moth & Rose and others. Judgment for plaintiffs, and certain defendants bring error. Affirmed.

E. G. Senter and Camp & Camp, all of Dallas, and Wear & Frazier and J. J. Averitte, all of Hillsboro, for plaintiffs in error. Morrow & Morrow, of Hillsboro, and Guthrie, Gamble & Street, of Kansas City, Mo., for defendants in error.

RAINEY, C. J. Appellants contracted with the Hillsboro independent school district to build a certain school building according to certain plans and specifications for the consideration of $50,000, and for the faithful performance of said contract appellants executed a bond for $25,000, payable to said school district with the General Bonding & Casualty Company as surety. When the building was nearing completion, the roof fell in and damaged the building. The said school district had to repair the building, causing it to expend more than the contract price, to recover which it brought suit against Da Moth & Rose and the surety company on its bond. Da Moth & Rose answered, denying that they were required to rebuild the house after it fell, and deny that there were any plans for concrete work prepared or agreed to by them, and that they furnished the building according to the original contract, and deny that they agreed upon the system of concrete reinforcement actually used, and that after the building fell plaintiffs in rebuilding it materially changed the plans, and expended more than was necessary to reconstruct the building. They further answered that under the contract they were to prepare the plans for the concrete work, but while doing so they were informed by the architect that he had adopted plans prepared by the Trussed Concrete Steel Company, and that they had never seen the same; that they proceeded in exact accordance with said plans under the direction of plaintiffs and the architect, the steel company superintending every step in the construction of that part of the building; that they constructed the building in accordance with the substituted plans of good material and workmanship. They allege that said plans were faulty, and that the fall of the building was due to that fact, and pray for judgment for $13,500 balance due on the contract price. The bonding company answered, admitting the execution of the bond, guarantying the carrying out of the original contract, but alleged that another and different contract between plaintiffs and Da Moth & Rose was entered into without its knowledge, setting out the particulars in which the changes were made; that said changes were material and caused the fall of the building, and

therefore claims it was released from said bond. It further alleged that the stipulated notice was not given; that after the fall of the building plaintiffs took charge of same, and made a different contract with another to complete it in a different manner, and knew, or could have known, that the work was being defectively done, and by failing to give notice they were estopped; that—

"the contract with Da Moth & Rose is unilateral on account of certain quoted powers given the trustees."

Da Moth & Rose interpleaded the two Trussed Concrete Steel Companies, and alleged that these companies are owners and exploiters of a system of reinforcing concrete known as the "Kahn System," and they make a part of their cross-plea their entire answer to the action of plaintiff, and in addition set out that such steel companies, knowing that the contractors were entitled under the contract to prepare their own plans for concrete reinforcement, took up secretly with the architect the matter, and induced him to adopt their plans and buy their product, and then notified the contractors that the steel companies' plans therefor had been adopted, and thereupon the architect instructed them to construct the same according to the steel companies' plans; that such system is a patented device, and novel and experimental, and their course in this instance in keeping with their usual course, and that these contractors had not used or known of said system before; and that the instructions of said architect made it necessary for them to proceed or give up the building. They further allege that when the revised plans of the steel companies adopted by the architect were submitted to them, they did not have a copy of the original plans, which had been delivered to the steel companies by the architect, and did not know that a material departure had been made from the original plans, and that both the architect and steel companies assured them that the original plans had been complied with in preparing the revised plans; that they believed these representations and relied upon the same; that thereupon the steel companies and the architect took control of the direction and construction of the reinforced concrete work, and took the same entirely out of the hands of the contractors; that they now know that said revised plans were insufficient and dangerous; that they materially departed from the original plans, and reduced the carrying power of all floors and the roof; that all such changes were made without the knowledge or consent of defendant contractors, and with the full knowledge of the steel companies; that the steel companies and architect made no effort to conform the strength and carrying capacity of the building in the revised plans to those of the original plans, well knowing that the contractors had no means of discovering the same, and that the contractors were wholly relying upon them to see that the same was done. They further allege that the architect and steel companies assumed absolute control, and superintended the mixing of the concrete and all other details; that by reason of the premises and those set out in their answer to the plaintiffs' petition, the steel companies are indebted to them for $12,000, less $2,500 that it would have cost them to finish the building, had it not fallen, and ask for judgment in the sum of $9,500, and that, in the event of recovery by the plaintiff against them, they have judgment over and against the steel companies therefor; and that such judgment inure to the benefit of the school district. The steel companies, in answer to the plea of Da Moth & Rose, deny that they were negligent in the construction of the plans, and deny that the building fell wholly by reason of defects in the roof. They allege they prepared plans and specifications for the construction of the reinforced part of said building under its system, and procured the architect to adopt them, and then procured Da Moth & Rose to order from them their materials for the construction thereof; that Da Moth & Rose knew in advance that they intended to submit such plans, and never objected or offered to submit any themselves; that after the plans had been adopted Da Moth & Rose waived their right to object by agreeing to purchase material from them; that it was agreed by Da Moth & Rose and them that the plans and drawings furnished by them should have no further effect than to show the amount of material required; that Da Moth & Rose were wholly incompetent, and did not keep a competent foreman on the job; that they failed to protect the concrete from the sun, which caused it to become weak, and contributed to the fall of the building; that they used poor sand; that they did not provide sufficient compressive resistance of concrete used; that they did not properly mix the concrete used; that they did not use proper proportions of sand, cement, gravel, etc., in making the concrete for slabs, beams, etc.; that they poured concrete into molds that contained boards, shavings, etc.; that they used the longer steel where it was not needed, and left an insufficient amount of long steel where needed; that they failed to connect the steel of one section to that of another; that they failed to dowel the steel and bend up the bars; that they failed properly to wet the mixtures and to protect the roof from the heat, and failed to test the development of the compressive strength of the concrete before removing the supports. A jury was impaneled, and after hearing the evidence the court peremptorily instructed a verdict for plaintiff against Da Moth & Rose and the bonding company and submitted special issues as to Da Moth & Rose and the steel companies, and upon the return of

the answers of the jury judgment was entered against Da Moth & Rose for $39,607.33, and against the bonding company for $25,000, and in favor of the steel companies on the issues between them and Da Moth & Rose. The bonding company perfected its appeal, but Da Moth & Rose resorted to writ of error instead, filing their petition and error bond in time to have the same incorporated in the same record with the bonding company's appeal. The statement of facts was agreed to by all the parties, and filed both here and in the court below in time, and the whole case is properly here for revision on one record.

The trustees of the Hillsboro Independent School District, desiring to erect a school building, employed C. H. Page of the firm of C. H. Page & Bro., architects of Austin, Tex., to prepare a preliminary outline, plans, and specifications and form of bids. This was done. The form of bids is as follows:

"―――― (the undersigned) hereby propose to furnish all labor and materials necessary for the erection and completion of the school building to be erected in Hillsboro, Hill Co., Texas, in strict accordance with the plans, specifications and details for same as prepared by C. H. Page & Bro., architects, Austin-Houston, Texas.

"Inclosed please find certified check in the sum of 5 per cent. of the amount of our bid ($―――――), in accordance with the 'Instructions to Bidders.'

"Bid No. 1: Complete as per plans and specifications ..................$――――

"Bid No. 2: Heating and ventilating as per plans and specifications........$――――

"Bid No. 3: Plumbing, as per plans and specifications .................:......$――――

"Bid No. 4: Wiring, as per plans and specifications ....................$――――

"Bid No. 5: Steam gravity heating, as per plans and specifications........$――――

"Alternate Bid No. 1: State the amount to be added or deducted if terra cotta is used in place of stone.

"Alternate Bid No. 2: State the amount to be added or deducted if terra cotta is used for cornice in place of copper.

"Alternate Bid No. 3: State the amount to be added if slate treads are used for all stairs, same to be one inch thick.

"Alternate Bid No. 4: State the amount to be added if all heating and ventilating flues are omitted and also plenum chambers.

"Alternate Bid No. 5: State the amount to be deducted if reinforced concrete beams are used in place of steel, with carrying capacity as specified for steel. This layout to be approved by the architects.

"Alternate Bid No. 6: State amount to be added or deducted if flat, fireproof roof is specified in place of the pitched roof specified, same to have tar and gravel roofing, suspended ceilings, and have a live load of 20 lbs. ――――, the undersigned, provided our bid is accepted, doth hereby agree to enter into contract and furnish acceptable bond within ten (10) days from the date on which the bids are opened, and guarantee to complete the said building on or before the ―――― day of ――――, A. D. 191―.
"[Signed] ――――――――."

The architect also prepared drawings, consisting of 22 pages, which, as prepared in his office, were drawn up on vellum, but were copied on what is known as "blueprint." These drawings showed the outline and character of the building, the number of rooms and stories, and the lighting system, heating system, the basement and the roof. The specifications and bids covered two characters of construction inside the building, i. e., a reinforced concrete construction or "layout," and a structural steel construction or "layout." On a part of the drawings which were prepared at the time the structural steel construction or layout alone was shown, it being contemplated that the persons who bid upon the building should, if they were inclined to do so, make bids upon the building upon each of said layouts or construction; that is to say, the bidders were invited to submit a proposition to build the building using a structural steel layout in the interior, as defined in the specifications and marked on the blueprints, or to substitute for the structural steel layout a reinforced concrete layout. The form in which this last-named proposal was invited was alternate bid No. 5. Numerous bids were submitted to the school board. On a meeting held on the 26th day of September, 1912, the bids were opened, among them that of Da Moth & Rose, as follows:

"Bid No. One: Complete, as per plans and specifications, $58,650.00.

"For concrete construction, instead of steel, deduct $8,650.00 from original bid, making $50,000.00, fifty thousand dollars.

"Layout to be approved by architect.
"[Signed] Da Moth & Rose.

"Terra cotta can be used in place of stone. No deduction.
"[Signed] Da Moth & Rose."

Separate bids were made by various parties for the plumbing, lighting, and heating of the building, which it was not contemplated by any of the parties should be included in the general contract. The school board accepted the $50,000 bid of Da Moth & Rose. On September 27, 1912, the contract for erecting the school building was entered into between the trustees and Da Moth & Rose, and provided, among other things, as follows:

"Article I. The contractor shall and will provide all the materials and perform all the work for the erection and completion of a grammar school building using reinforced concrete beams and lintels and beams and flat gravel roof layout to be approved by the architects, as shown on the drawings and described in the specifications prepared by C. H. Page & Bro. of Austin, Texas, architects, which drawings and specifications are identified by the signatures of the parties hereto, and become hereby a part of this contract.

"Art. II. It is understood and agreed by and between the parties hereto that the work included in this contract is to be done under the direction of the said architects, and that their decision as to the true construction and meaning of the drawings and specifications shall be final. It is also understood and agreed by and between the parties hereto that such additional drawings and explanations as may be necessary to detail and illustrate the work to be done are to be furnished by said architects, and they agree to conform to and abide by the same so far as they may be consistent with the purpose and intent of the original drawings and specifications referred to in article 1.

"It is further understood and agreed by the parties hereto that any and all drawings and

specifications prepared for the purposes of this contract by the said architects are and remain their property and that all charges for the use of the same, and for the services of said architects, are to be paid by the said owners.

"Art. III. No alterations shall be made in the work except upon written order of the architects; the amount to be paid by the owners or allowed by the contractors by virtue of such alterations to be stated in said order. Should the owners and contractors not agree as to the amount to be paid or allowed, the work shall go on under the order required above, and in case of failure to agree, the determination of said amount shall be referred to arbitration, as provided for in article 12 of this contract.

"Art. IV. The contractors shall provide sufficient, safe and proper facilities at all times for the inspection of the work by the architects or their authorized representatives; shall, within twenty-four hours after receiving written notice from the architects to that effect, proceed to remove from the grounds or buildings all materials condemned by them, whether worked or unworked, and to take down all portions of the work which the architects shall by like written notice condemn as unsound or improper, or as in any way failing to conform to the drawings and specifications, and shall make good all work damaged or destroyed thereby.

"Art. V. Should the contractors at any time refuse or neglect to supply a sufficiency of properly skilled workmen, or of materials of the proper quality, or fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of any of the agreements herein contained, such refusal, neglect or failure being certified by the architects, the owners shall be at liberty, after three days' written notice to the contractors, to provide any such labor or materials, and to deduct the cost thereof from any money then due or thereafter to become due to the contractors under his contract; and if the architects shall certify that such refusal, neglect or failure is sufficient ground for such action, the owners shall also be at liberty to terminate the employment of the contractors for the said work and to enter upon the premises and take possession, for the purpose of completing the work included under this contract, of all materials, tools and appliances thereon, and to employ any other person or persons to finish the work, and to provide the materials therefor; and in case of such discontinuance of the employment of the contractors they shall not be entitled to receive any further payment under this contract until the said work shall be wholly finished, at which time, if the unpaid balance of the amount to be paid under this contract shall exceed the expense incurred by the owners in finishing the work, such excess shall be paid by the owners to the contractors, but if such expense shall exceed such unpaid balance, the contractors shall pay the difference to the owners. The expense incurred by the owners as herein provided, either for furnishing materials or for finishing the work, and any damage incurred through such default, shall be audited and certified by the architects, whose certificate thereof shall be conclusive upon the parties."

"Art. X. It is further mutually agreed between the parties hereto that no certificate given or payment made under this contract, except the final certificate of final payment, shall be conclusive evidence of the performance of this contract, either wholly or in part, and that no payment shall be construed to be an acceptance of defective work or improper materials."

"It is further agreed that should the owners fail to sell their bonds within sixty days then this contract shall become null and void."

Da Moth & Rose presented their bond with the contract attached, which bond is as follows:

"Know all men by these presents: That we, Da Moth & Rose, a copartnership composed of S. L. Da Moth and Charles R. H. Rose, both of Dallas, Texas (hereinafter called the principal), and the General Bonding and Casualty Insurance Co., of Dallas, Texas, a corporation created and existing under the laws of the state of Texas (hereinafter called the surety), are held and firmly bound unto the Hillsboro Independent School District of Hillsboro, Texas (hereinafter called the obligee), in the full and just sum of twenty-five thousand dollars ($25,000.00), lawful money of the United States, to the payment of which sum, well and truly to be made, the principals bind themselves and their heirs, executors and administrators, and the said surety binds itself, its successors and assigns, jointly and severally, firmly by these presents.

"Signed, sealed and delivered this the 1st day of October, A. D. 1912.

"Whereas, said principals have entered into a certain written contract with the obligee, for the erection and completion of a school building in Hillsboro, Texas, as per copy of contract attached hereto and made a part hereof: Now, therefore, the condition of the foregoing obligation is such that if the said principal shall well and truly indemnify and save harmless the said obligee from any pecuniary loss resulting from the breach of any of the terms, covenants and conditions of the said contract on the part of the said principals to be performed, then this obligation shall be void; otherwise to remain in full force and effect in law; provided, however, that this bond is issued subject to the following conditions and provisions:

"First. That no liability shall attach to the surety hereunder unless, in the event of any default on the part of the principal in the performance of any of the terms, covenants or conditions of the said contract, the obligee shall promptly, and in any event not later than thirty days after knowledge of such default, deliver to the surety at its office in the city of Dallas, written notice thereof with a statement of the principal facts showing such default and the date thereof; nor unless the said obligee shall deliver written notice to the surety at its office aforesaid, and the consent of the surety thereto obtained, before making to the principals, the final payment provided for under the contract herein referred to.

"Second. That in case of such default on the part of the principals, the surety shall have the right, if it so desire, to assume and complete or procure the completion of said contract; and in case of such default, the surety shall be subrogated and entitled to all the rights and properties of the principals arising out of the said contract and otherwise, including all securities and indemnities theretofore received by the obligee, and all deferred payments, retained percentage and credits, due to the principals at the time of such default, or to become due thereafter by the terms and dates of the contract.

"Third. That in no event shall the surety be liable for a greater sum than the penalty of this bond, or subject to any suit, action or other proceeding thereon that is instituted later than the 1st day of October, A. D. 1913.

"In testimony whereof, the said principals have hereunto set his hand and seal, and the said surety has caused these presents to be sealed with its corporate seal, duly attested by the signature of assistant secretary, the day and year first above written.

"[Signed]   Da Moth & Rose        [Seal.]
                "By S. L. Da Moth.  [Seal.]
"[Signed]   General Bonding & Casualty Ins. Co.,
                "By T. A. Smith, Asst. Secretary.
"Signed, sealed, and delivered in the presence of
                "[Signed]  Geo. Hogan."

At a regular meeting of said trustees on December 3, 1912, said bond was formally approved. After the contract with Da Moth

& Rose was executed and the bond approved, the school board took no further action with reference to the matter except to make payments on the architects' certificates as the building progressed, and the school board took no part at any time in the selection of the kind of reinforced concrete system that was to be used, or that was used. When the bids were solicited, the plans and specifications then in existence called for a steel construction, although the bids called for either a steel or reinforced concrete construction, the latter to be approved by the architects. Da Moth & Rose bid on the latter construction and the building contract provided therefor. Da Moth & Rose proceeded with the reinforced concrete construction until near completion, when the concrete, from defective mixing, etc., gave way, the roof fell in, and the construction was virtually a wreck causing great damage. Da Moth & Rose and the bonding company were duly notified thereof. Both refused to repair the damage and complete the building. Thereupon the school trustees took charge and completed the same. Up to the time said building collapsed the trustees had paid to Da Moth & Rose on estimates made by the architect $38,000, leaving in their hands unpaid on the contract price $12,000. To repair and complete the building it cost the trustees $51,607.33. These expenditures were made under the supervision of the architects' superintendent, and were O. K.'d and approved by the architects, and were reasonable and necessary.

[1, 2] Da Moth & Rose complain of the overruling of their motion for continuance. One of the grounds in said motion was that plaintiff, by an amended petition filed November 25, 1914, alleged new matter presenting equities involving surprise, and for which further time was needed by them to meet it. Plaintiffs' original petition, filed September 15, 1913, set out the building contract, the plans and specifications, and the surety bond, and alleged the liability to construct and had failed. The damages were estimated at $30,000. The amended petition alleged, in effect, that the building had been reconstructed by plaintiffs, and the damage was placed at $39,000. There was no new cause of action set up by plaintiffs, and no cause for legal surprise on the part of Da Moth & Rose. The motion was purely an equitable one, and as to Da Moth & Rose the court did not abuse its discretion. The trial lasted about two weeks, and Da Moth & Rose were allowed to amend their pleadings during the trial, and there is nothing in the record to show that they were deprived of presenting any defense they may have had to plaintiffs' cause of action. There was no error in the action of the court in not striking out the amendment of plaintiff for the reason just preceding.

Da Moth & Rose moved to suppress the depositions of certain witnesses, which motion was overruled. These depositions relate to the controversy between Da Moth & Rose and the steel company, and the plaintiffs had no part in their introduction in evidence, and the court's ruling does not affect them; therefore the assignment relating to this matter will be discussed when the cross-action against the steel company is treated in this opinion.

[3] Da Moth & Rose complain of the court for instructing a peremptory verdict and rendering judgment for plaintiffs, because the judgment is excessive and not supported by the evidence, and submits the following proposition:

"The court instructed the jury to return a verdict in favor of the plaintiff against Da Moth & Rose for the sum of $51,607.33, being the difference between the amount the plaintiff paid Hatcher for tearing out and reconstructing the interior and roof and reconstructing the same and the amount which was unpaid upon the original contract to Da Moth & Rose, and there were certainly jury questions raised by the testimony both as to whether Da Moth & Rose were liable at all, and as to the extent of their liability, and especially as to whether or not the architect and superintendent was the agent of the plaintiff in adopting less safe plans and requiring Da Moth & Rose to follow them, and as to whether or not all the work which Hatcher did in tearing out all the interior and roof and replacing the same was necessary by reason of a failure of De Moth & Rose to properly build it in the first instance, and what part of the expense of this work by Hatcher, if any, was made necessary by reason of the failure of Da Moth & Rose to properly construct it according to their contract."

Da Moth & Rose contracted with the school trustees to erect and complete a grammar school building, using reinforced concrete beams and lintels and beams and flat gravel roof layout to be approved by the architect. They adopted plans for a reinforced concrete construction known as the "Kahn System," which were approved by the architect and proceeded to build in accordance therewith, but they negligently failed to construct and complete it in a skillful and workmanlike manner, which caused the roof to fall in and practically wreck the building before the same was completed. They refused and failed to complete the building, which necessitated the school trustees to take charge and complete the same at great expense, which expense was certified to and approved by the architect, he testifying that it was necessary and reasonable for the completion of the building. In Lonergan v. Trust Co., 101 Tex. 63, 104 S. W. 1061, 22 L. R. A. (N. S.) 364, 130 Am. St. Rep. 803, a case similar to this, Mr. Justice Brown, speaking for the court on the question of guaranteeing of plans and specifications, etc., stating the liability of the contractor after completion of the building and delivery to the owner if it then falls the contractor will be released, then says:

"It has been just as uniformly held, however, that whenever the building or structure has been destroyed by reason of any defect in the work done, or by any accident or any means whatever before the contract has been complet-

ed, then the contractor must bear the loss, no matter what might be the occasion thereof, unless it be some wrong done by the owner subsequent to the making of the contract which caused the fall. Liability of the builder does not rest upon a guaranty of the specifications, but upon his failure to perform his contract to complete and deliver the structure."

Da Moth & Rose failed to complete the building, and, it having fallen without wrong of plaintiffs, they became liable to the plaintiffs for the damages resulting by their failure to reconstruct. In tearing away the rubbish caused by the fall and to properly reconstruct the building, it became necessary to make some changes in the specifications, which changes put them at less expense than if the original plan had been pursued. In reconstructing, defects were discovered in the workmanship which increased the expenses. All the. reconstruction work done for plaintiffs to complete the building was done under the supervision and direction of the original architect. The evidence, without material contradiction, shows the liability of Da Moth & Rose, and justified the trial court in instructing verdict against them, and, the plaintiffs being compelled to reconstruct the building and the architect having approved the expenses incurred, which were necessary and reasonable, they have no cause to complain.

[4, 5] We will next consider the contentions of appellant bonding company. It contends that it is not liable, because that after it contracted in view of certain plans and specifications furnished by the school trustees, certain material changes were made therein, which released its obligation. When the plans and specifications for the construction of the building were bid on, a steel construction was provided for the interior of the building. At the same time bids were submitted which called for either of two interior constructions, one steel and the other reinforced concrete, which provided that plans should be approved by the architect. Da Moth & Rose bid $50,000 for using the reinforced concrete layout, which bid was accepted by the school board. A contract was entered into between Da Moth & Rose and the school board for the erection of the building according to the reinforced concrete. At the same time they filed the bond of the bonding company with the school board with the contract attached, which contract provided for the use of the reinforced concrete layout, which was to be approved by the architect. Da Moth & Rose selected the system for reinforced concrete known as the "Kahn System," which was approved by the architect, the school district board taking no action therein, but the construction was left entirely with the contractors and the architect. It is clear that the contract by its terms provided for the use of reinforced concrete in the erection of the building, the plans to be approved by the architect. The bond was executed by the bonding company

for the faithful performance of said contract, and it was evidently contemplated by all the parties that reinforced concrete was to be used in the construction, as the architect might approve. Complaint is made that the original plans called for a steel hip roof, and that instead a flat gravel roof was substituted therefor. The contract by its terms provided that a flat gravel roof was to be used in the construction and the bonding company stands in relation to this change as it does to the change to reinforced concrete. Complaint is also made that terra cotta was substituted for the finish instead of stone, as provided by the original plan. When bids were submitted alternate bid No. 1 was:

"State the amount to be added or deducted if terra cotta is used in place of stone."

In their bid Da Moth & Rose stated, "No reduction." This change we consider technical and not material. It related to the ornamentation of the building, and in no way affected the plan of construction or strength of the building. In article III it is contemplated that changes can be made upon the written order of the architect, and in preparing the plans for the reinforced concrete structure and the flat gravel roof it was also provided for the substitution of terra cotta for stone. Da Moth testified that:

"In the place of the solid stone on the plans I worked by there was terra cotta. The terra cotta, so far as their utility was concerned. didn't cut much ice in the building. It was a matter of ornamentation rather than strength. One would be about the same as the other, and my idea was that one would be about as expensive as the other; I would just as soon put in one as the other."

[6] Plaintiff in error complains that the school district board breached article 9 of contract in failing to retain 20 per cent. of the contract price from time to time as the work progressed until completion and acceptance of the work. The contract did provide for the retaining of 20 per cent. until the completion and acceptance of the work. It also provided for payments of the contract, $50,000, as the work progressed to be paid only upon certificates of the architect, and all payments shall be due when certificates for same are issued. All the payments that had been made by the board were made on the certificates of the architect which amounted to $38,000, leaving $12,000 still to be paid on the contract price. It seems that the school district board, when it made payments, was trying to comply with the contract by paying on the certificates. If the architect was mistaken, or if he colluded with the contractors, which the board did not know and it was ignorant of the true amount, and if it was too great, it should not be held responsible for a breach. McKenzie v. Barrett, 43 Tex. Civ. App. 451, 98 S. W. 232; Kilgore v. Society, 89 Tex. 465, 35 S. W. 145. Among the cases cited to support the foregoing proposition is one recently decided by

our Supreme Court. Bullard v. Norton (Sup.) 182 S. W. 668, opinion by Mr. Justice Yantis. A surety on a builder's bond was defending on a builder's bond on the ground of material change in the contract, and that the owner had not retained the per cent. stipulated for. In discussing this point it is said:

"It is well settled that sureties are only bound by the precise terms of the contract whose performance they secure, and that any material alteration in the terms of the contract without their consent will release them from liability"

—and this rule we in no wise wish to contovert. However, in that case the owner had not retained any of the contract price, but had paid it out to contractor. In the instant case the owner not only paid out what money was paid on the certificate of the architect as per stipulation in the contract, but retained $12,000, which is more than 20 per cent. of the contract price.

[7] The bonding company complains that it was not notified of the default of the contractors within 30 days after their default, the evidence showing that the building was defectively constructed from the basement floor to the roof. The bond in suit provides for notice of default of contractors within 30 days after knowledge of such default. The school district trustees had no knowledge of the defective construction until after the roof had fallen in, and the next day thereafter the bonding company was notified in writing of such fact. The provision of the bond relating to notice was not violated by the school trustees, and said complaint is overruled. The evidence shows that the bond was executed to secure Da Moth & Rose's faithful discharge of their contract; that they had breached the same without any fault of the school trustees, and that said trustees had been damaged and put to great expense in rebuilding, and the bonding company is in no position to defeat liability on the bond, and as it was shown that the expenses of the trustees was caused by the fault of Da Moth & Rose, there was no error in the court's instructing a verdict for the school trustees.

We will now consider the cross-action of Da Moth & Rose against the Trussed Concrete Steel Companies, which was submitted to the jury on special issues.

The first proposition that arises is the overruling of the motion of Da Moth & Rose for continuance. As we will reverse the judgment on this branch of the case, and as the same grounds for a continuance are not likely to exist on another trial, the action of the court becomes immaterial.

[8] A motion was made by Da Moth & Rose to suppress the depositions of various witnesses taken at the instance of the steel company. One of the grounds was the misconduct of W. F. Guthrie, attorney for the steel company, in that said Guthrie wrote and sent direct interrogatories to several of said witnesses, inquiring as to what their answers would be. After receiving replies said attorney prepared interrogatories and sent them to Da Moth & Rose's attorney to be crossed. After being crossed, they were returned to Guthrie when they were handed to a notary public who took the depositions. When the depositions were returned into court, there appeared in the space between the cross-questions where the answers were written, in addition to said written answers, pencil writing answers, virtually the same as those taken down by the notary. Guthrie testified, in effect, the same scheme was pursued in the depositions as to three-fifths of all the witnesses. Counsel for Da Moth & Rose contend that these facts warrant the conclusion that the answers of the witnesses were revised by the steel company's attorney, and that the answers were dictated to the witnesses and reflected only such answers as the steel company desired. The evidence is not of such probative force as to warrant us in concluding that there was such improper conduct on the part of the steel company in taking the depositions that requires their suppression. There is nothing to show that the notary public acted improperly in taking the deposition. There is no evidence that the steel company, nor its attorney framed any answers or dictated them, or induced the witnesses to make answers other than those they felt inclined to, or what they believed to be true. There is no evidence to show that any one other than the witness himself penciled his answers on the cross-interrogatories, or that such penciling was done by him at the dictation or influence of any other person. In Greening v. Keel, 84 Tex. 326, 19 S. W. 435, the court passed upon the suppression of depositions taken under the following facts:

"Plaintiffs caused some written interrogatories to be privately presented to the said Carpenter and his answers to be taken to them and written down. This was all done without the knowledge of the defendant. Afterward the plaintiffs filed interrogatories to the witness, and, having caused defendant to be served with notice, had his deposition taken under a commission. Neither the private interrogatories nor the answers made thereto were made part of or attached to the interrogatories served upon the defendant, but in the ones so served the witness was asked to examine the private interrogatories and answers thereto, which were produced by the officer who took his deposition, and the witness testified that they were correct, and attached the answers to his deposition. The witness appears to have testified to substantially the same facts in response to the interrogatories served upon the defendant that he did to the others."

Mr. Justice Henry, in speaking for the court, said:

"It was unquestionably the right of the plaintiffs to ascertain from the witness what he knew about the case, for their guidance in propounding interrogatories to him. But it was not proper for his answers to be first taken in writing, under oath or otherwise, and for them, when so taken, to be used to aid or influence him when he came to give his deposition. Perfect equality and fairness is of so much importance

in the act of taking depositions that such transactions must be condemned without regard to the motive or their actual effect at the time. * * * We are not advised in what form the private questions were put. They may have been leading, and thus tending to an undue advantage. The fact that the witness was aged and of a somewhat infirm memory, and that the examination was mainly about the dates of very old transactions, are well calculated to add to our doubts about the propriety of the course pursued with him; but independently of any of these things, we are of the opinion that the deposition should have been suppressed, because it should be conclusively presumed that the witness may have been to some extent influenced by the course pursued"

—and reversed the case. In that case the witness was asked to examine the private interrogatories and answers thereto, which were produced by the officer taking the deposition, which shows that the officer was acting for the plaintiff in a way that was calculated to cast suspicion upon his impartiality. In this case evidence is lacking that the steel company's attorney did more than have the witness to put into writing his answers to the direct interrogatories sent him.

[9] The motion to suppress Mundt's deposition was based on another ground and that is the failure to answer cross-interrogatory No. 10. This is a good reason, when shown, for quashing a deposition, and it was shown in this case, but we think the question was unimportant. If, however, the answer becomes material on another trial, the deposition should be quashed. Davis v. McCartney, 64 Tex. 584.

[10] The court sustained objection to cross-interrogatory No. 5, propounded to witnesses Thompson, Miller, Dunning, Brillhart, and Burnett. This interrogatory relates to the general plan and the substitution of a less number of pillars for the support of the roof, and the objection seems to have been that it elicited the opinion of the witnesses, and that there was not sufficient facts stated upon which to base an opinion. The bill of exceptions does not show exactly what objection was urged, nor what facts were placed before the witnesses, and is such that we would be justified in not considering it. But counsel state that in the direct interrogatories all the facts had been stated by the steel company, and they had qualified as expert witnesses, and capable to testify in regard to the strength and stability of the structure with reinforced concrete. If there had been an examination of the witnesses as to their qualification, etc., by direct interrogatories by the steel company, then the answers to the cross-interrogatory should have been admitted, for they were pertinent to the issue, and their weight left to the jury. It is complained that:

"The court erred in sustaining the objections of the defendant Trussed Concrete Steel Company of Texas to the introduction by defendants Da Moth & Rose of certain letters addressed by said defendant Trussed Concrete Steel Company of Texas to C. H. Page & Bro., Austin, Tex., dated Dallas, Tex., October 29, 1912."

There was an issue between Da Moth & Rose and the steel company as to which was responsible and liable for the adoption of the Kahn system, and the offered testimony should have admitted.

[11] The court erred in not sustaining the motion of Da Moth & Ross to strike from the record the answer of witness Plumb to direct interrogatory No. 11, which, in effect, states the cause of the fall of the building, and which was an invasion of the province of the jury. Interrogatory No. 11 was:

"What, in your opinion, based on your personal experience and your personal examination and other information obtained in connection therewith, was the cause or causes of the fall of this roof? As far as your opinion is based upon information from others, kindly state what that information was so that the correctness of such information can be otherwise investigated during the course of the trial of this case."

The answer to this interrogatory takes up about three typewritten pages of the transcript, giving facts gained from experience and from hearsay, irresponsive in some particulars, and interspersed with argument showing the cause of the fall of the building and giving his opinion as to an ultimate matter that was an issue alone for the jury to determine. The opinion of the witness under the circumstances was clearly improper, and should have been excluded.

[12] Counsel for the steel company say this assignment ought not to be considered, because in the motion for new trial this matter was not called to the attention of the court. In the motion for new trial it is mentioned as "interrogatory No. 10, as per bill of exceptions No. 51." In this bill it is shown to be interrogatory No. 11, and calling it "No. 10" was clearly a clerical error.

[13] It is contended by the steel company that the objection was to the whole answer; that part of same was competent, and, such being the case, there was no error in overruling the objection. Usually that is true. The opinion of the witness as an expert was sought, and it was necessary for him to state the facts he did to show his qualification, and it is so interwoven and connected with his opinion that it is difficult to separate the material from the immaterial which renders it objectionable.

We have considered all the assignments of error, and find no reversible error as to the judgment against Da Moth & Rose on its contract and bond, nor as to the bonding company, and it is affirmed as to them, but as to the steel company, for the reason stated, it will be reversed and cause remanded.

Affirmed in part, reversed and remanded in part.

## On Rehearing.

[14] The motion of Da Moth & Rose and the bonding company for rehearing as to the judgment of affirmance in favor of the school district is overruled, but, as to motion of the Trussed Concrete Steel Companies for rehearing on the judgment of reversal and re-

manding as to them, we have concluded that we were in error in holding that the allegations were sufficient to show that Da Moth & Rose had a cause of action against them. After a reconsideration of the whole facts, we think errors of the trial court in the admission of improper evidence becomes immaterial, because the evidence fails to show any right of recovery on the part of Da Moth & Rose on their cross-action against the steel companies. The cause of action alleged against the steel companies was, in effect, the preparing of drawings for the school building, which drawings were unsuitable and insufficient. Da Moth & Rose introduced in evidence the contract between them and the steel companies for the furnishing of the material to be placed in said building, and in said contract it was stipulated:

"Where general information and drawings are furnished for the proper placing of our products in the structure, it is understood that these drawings are furnished gratis and form no part of this contract, other than that they specify the amount of material contemplated in the order. The drawings must not be used before being rechecked by the purchaser, or his architect, and the purchaser alone shall be responsible for the correctness of said drawings."

The evidence shows that said drawings were rechecked by and O. K.'d by the architect and accepted by Da Moth & Rose. By the terms of said contract Da Moth & Rose alone became responsible for the correctness of said drawings, which relieved the steel companies from any liability to them for any defects in said drawings, if any existed. Therefore, it being shown that the steel companies were not liable for furnishing the drawings, the admission of the evidence for which we reversed the case became immaterial, as no other judgment could be rendered, than that of affirmance.

· The motion of the steel companies for rehearing is granted, and judgment is rendered, affirming the judgment of the court below as to them.