GARRETT et al. v. DODSON et al.
(No. 1236.)

(Court of Civil Appeals of Texas. Amarillo.
Nov. 14, 1917. Rehearing Denied
Dec. 19, 1917.)

1. PRINCIPAL AND SURETY ⬤⟿118, 156—RELEASE OF SURETIES—PLEA BY PRINCIPAL—INURING TO BENEFIT OF SURETIES—STATUTES.

Any plea by the principal of a building contractor's bond which if established will release him will also release his sureties, and will inure to their benefit whether urged by them or not in a separate plea; for, under Vernon's Sayles' Ann. Civ. St. 1914, arts. 1842, 1897, judgment cannot be rendered against parties secondarily liable where no judgment is rendered against the primary obligor.

2. PRINCIPAL AND SURETY ⬤⟿165—APPEAL—RIGHT TO URGE NONLIABILITY ON APPEAL UNDER PRINCIPAL'S PLEA.

When a principal and his sureties are sued in the same action on the same contract, if the principal pleads facts showing nonliability, defeating judgment against him, whether the same facts are pleaded by the sureties or not, they can urge below and on appeal nonliability under the principal's plea.

3. CONTRACTS ⬤⟿284(4) — BUILDING CONTRACT—INTERPRETATION BY SUBCONTRACTOR.

Under a building contract providing that in the event of any question arising respecting the true intent and meaning of the drawings or specifications, or as to the fitness of material or labor, the architect's decision should be final and conclusive, the interpretation of the plans by a subcontractor on brickwork could not control, and, if the architect is to be charged with arbitrarily fixing a height from the grade line, the plans for fixing it should be shown.

4. CONTRACTS ⬤⟿247—BUILDING CONTRACT—AGREEMENT BY CONTRACTOR TO ALTERATIONS—SUFFICIENCY OF EVIDENCE.

In an action against a building contractor and his sureties, evidence *held* to show that the contractor agreed to every change in the original specifications, and received pay for extra work and material, except for brick which went into the building, and which he bought or contracted for before he signed the contract or did the work, so that the court properly refused to submit an issue asking a finding whether the architect was unfair in his demands with regard to extra work required under the contract, etc.

5. CONTRACTS ⬤⟿322(4)—BUILDING CONTRACT—REMOVAL OF WALL BY ARCHITECT—EVIDENCE.

The architect's act in causing the removal of a brick wall of a church under construction was prima facie evidence or conclusive evidence that he did so properly under the powers granted him by the building contract and specifications to determine whether work was properly done.

6. CONTRACTS ⬤⟿322(4) — BUILDING CONTRACTS—ARBITRARY ACTION OF ARCHITECT IN ORDERING REMOVAL OF WALL—SUFFICIENCY OF EVIDENCE.

In an action against the contractor to build a new church, and his sureties, evidence *held* insufficient to support finding that the architect was unjust or arbitrary in directing the removal of a brick wall as not conforming to specifications.

7. CONTRACTS ⬤⟿284(4) — BUILDING CONTRACT—JUDGMENT OF ARCHITECT—BINDING FORCE ON BOTH PARTIES.

The judgment of the architect, under the terms of the contract for the erection of a church building giving him full powers to deter-

mine whether the work conformed with specifications, that a brick wall did not so conform, bound both the church trustees and the contractor for the work.

8. CONTRACTS ⬤⟿292—BUILDING CONTRACT—FRAUD OF ARCHITECT — ABANDONMENT BY CONTRACTOR.

If there was fraud and collusion between the architect and the building committee of a church in relation to the architect's ordering the removal of a brick wall as not conforming to specifications, the contractor could have abandoned the contract.

9. CONTRACTS ⬤⟿291—BUILDING CONTRACT—DEFECTIVE JUDGMENT BY ARBITRATOR — ABANDONMENT.

Where the parties to a building contract select an arbitrator, such as the architect, to decide whether the work meets specifications, a defective judgment by the arbitrator does not justify abandonment of the work by the contractor.

10. CONTRACTS ⬤⟿305(1) — BUILDING CONTRACT—BREACH—WAIVER OF BREACH.

If the architect arbitrarily or unjustly directed the contractor for a church building to take down a brick wall as not meeting specifications, and the arbitrary or unjust direction could be imputed to the building committee, the contractor should have declined or refused to comply, and, if insisted upon, should have abandoned the work and treated the act as a renunciation on the part of the building committee; but, having accepted the judgment of the architect and having complied with his request, he elected to continue under the contract, or waived his right to treat the direction as a breach, and though he might be entitled, after complying with the direction, to recover damages by reason of such arbitrary act, he could not base a defense thereon to the charge of subsequent abandonment of the contract.

11. TRIAL ⬤⟿349(4) — SUBMISSION ON SPECIAL ISSUES—GENERAL CHARGE.

A case having been submitted on special issues, it would have been improper to have given the general charge requested for defendant, if otherwise correct.

12. JUDGMENT ⬤⟿253(1) — CONFORMITY TO PLEADING—AMOUNT.

Judgment on an item sued for could not be for more than claimed in the petition.

13. JUDGMENT ⬤⟿256(6)—SUPPORT BY VERDICT—REMITTITUR.

Though as a rule the judgment must be based on the verdict, where the verdict is excessive a remittitur may be filed, and any error in rendering judgment for the amount authorized without formally entering a judgment and then filing a remittitur is immaterial.

14. TRIAL ⬤⟿340(1)—VERDICT—OMISSIONS—FINDING BY COURT.

In an action by church trustees against a building contractor for the amount over the contract price expended by the trustees in completing the work after the contractor's abandonment, the jury not being required by an issue to find what sum the material left on the ground brought after the completion of the building, the court properly could do so.

15. DAMAGES ⬤⟿227—DOUBLE RECOVERY — REMISSION.

In an action against the contractor to erect a church building and his sureties to recover the cost over the contract price of completing the building after the contractor's abandonment, where the building committee of the church had paid the contractor 80 per cent. for material which he failed to apply on the bill of an intervening materialman, the intervener releasing the building committee for the 20 per cent. used by them, which they had not paid, the court properly rendered judgment against the sure-

ties in favor of intervener for the sum due him, without deducting the amount so recovered by the intervener from the judgment rendered in favor of the building committee; such judgment not constituting double recovery.

**16. JUDGMENT ⬤⟿256(2) — CONFORMITY TO VERDICT.**

The court may make a specific finding for an item and render judgment therefor without finding by the jury, when the issue is not submitted to the jury and none requested; there being evidence in the record supporting the finding.

**17. DAMAGES ⬤⟿45—BUILDING CONTRACT — INSURANCE.**

Where a contract for the erection of a church building provided that the contractor should maintain insurance in his own name and that of the owner against loss by fire, etc., and also obligated him to carry liability insurance, but such obligations were breached by the contractor, he and his sureties were liable for the cost of insurance paid by the church trustees.

**18. PRINCIPAL AND SURETY ⬤⟿82(1)—SURETIES FOR BUILDING CONTRACTOR—ABANDONMENT OF CONTRACT—LIABILITY TO OWNER.**

When the sureties for a contractor for a building executed bond that he should faithfully perform, and he abandoned the contract before completion, and the owner completes at extra cost, the owner is entitled to judgment on the bond.

**19. DAMAGES ⬤⟿79(1)—LIQUIDATED DAMAGES OR PENALTY—BUILDING CONTRACT.**

Where a contract for the erection of a church building provided that the contractor should pay as liquidated damages, and not as penalty, $5 for each day he should be in default, such clause authorized the recovery of $5 a day for 78 days' delay in completion occasioned by the contractor's breach by abandonment and forcing the church trustees to take charge and complete the building; the amount not being a penalty.

**20. APPEAL AND ERROR ⬤⟿742(6)—ASSIGNMENT OF ERROR—PROPOSITIONS—RELEVANCY.**

In an action by the trustees of a church against the contractor to erect a church building and his sureties, propositions that the evidence will not warrant judgment at an amount per day for delay in completion are not relevant to the assignment that the court erred in entering judgment for plaintiffs for $5 a day for 78 days' delay in completion, because there was no evidence of unnecessary delay nor evidence that $5 per day was reasonable compensation.

**21. CONTRACTS ⬤⟿322(4) — BUILDING CONTRACT — JUSTIFICATION OF CONTRACTOR'S ABANDONMENT—SUFFICIENCY OF EVIDENCE.**

In such action, evidence *held* to warrant the trial court's finding that the building committee of the church or the architect were not guilty of any such wrong as would justify the contractor in abandoning.

**22. PRINCIPAL AND SURETY ⬤⟿100(3)—RELEASE OF BUILDING CONTRACTOR'S SURETIES—CHANGES IN WORK—STATUTE.**

Independently of and under Acts 34th Leg. c. 143, amending Rev. St. 1911, art. 5623, and adding article 5623a, which provides that the owner of a building to be erected shall take out a good and sufficient bond giving him, the materialmen, and laborers a right of action, and which further provides that no change or alteration in the plans, construction, etc., shall avoid or affect the liability on the bond, and the sureties shall be limited to such defense only as the principal could make, sureties of the contractor to erect a church building were not released by changes in the work, such as the coloring of the mortar, the making of rake-out joints instead of trowel joints, the putting in

of a stone belt, etc., where the contract authorized the making of changes under the architect's direction and payment therefor by the church trustees, while the architect authorized, and the trustees paid for the changes.

Appeal from District Court, Hardeman County; J. A. Nabers, Judge.

Action by S. H. Crossley and others, as trustees of the Methodist Episcopal Church South at Chillicothe, Texas, as successors of O. H. Dodson and others, former trustees, against A. M. Garrett and others, wherein the Decatur Cornice & Roofing Company of Decatur, Alabama, intervened. From a judgment for plaintiffs, defendants appeal. Judgment affirmed.

Cunningham & Oliver, of Abilene, D. E. Decker, of Quanah, and W. J. Arrington, of Paducah, for appellants. L. W. Allred, of Chillicothe, and W. D. Berry, of Vernon, for appellees.

HUFF, C. J. This action was prosecuted upon an amended petition by S. H. Crossley, E. M. Haynes, R. E. Wafer, J. P. McPherson, D. M. Norwood, John B. Mulky, and A. S. Curry, as trustees of the Methodist Episcopal Church South at Chillicothe, Tex., who alleged that they are the successors of O. H. Dodson et al., who were former trustees of the church and who entered into a certain building contract for the erection of a church in the town of Chillicothe, for that denomination, with one A. M. Garrett, as contractor. The building was to be erected for the sum of $12,477.77, according to certain plans and specifications drawn by one R. H. Stuckey, as architect, and made a part of the contract. And also a suit on a bond executed by W. J. Garrett, P. C. Wray, W. E. Green, and J. Renfro, in the sum of $6,300, conditioned on the faithful performance of the above contract, making the contract and specifications part of the bond. It is alleged that the contractor, A. M. Garrett, defaulted in the performance of said contract and abandoned the building before it was completed, and that under the terms of the contract the building committee of the church took charge of the building and completed it at a cost necessarily greatly in excess of the sum for which Garrett agreed to build the same, and that there was due from the contractor an excess of costs of construction in the sum of $3,140.21, and they also sued for liquidated damages on account of delay and for insurance paid out by the committee, and for a certain sum of $300, paid out on account of repairing a defective roof. The contractor and sureties answered separately, which will not be set out at this time, but will be noticed further on. The answer of the sureties pleaded material alteration in the contract and release thereby and this was replied to by supplemental petition, which will not be necessary to mention; also, there was an

intervention by the Decatur Cornice & Roofing Company of Decatur, Ala., claiming an indebtedness for material furnished in the erection of the house to the sum of $752.66.

The first assignment is to the refusal of the trial court to give special charge No. 2. This charge requested the submission of two special issues:

"(1) Was the architect, R. H. Stuckey, named in the plans and specifications, unfair in demands upon the defendant A. M. Garrett, with regard to extra work required under the contract, in allowance for such extra work? (2) Was the architect, R. H. Stuckey, unfair, and did he arbitrarily demand and require the removal of completed work on the building?"

A. M. Garrett, the contractor, in his answer, sets up the following:

"(4) And further answering, the defendant A. M. Garrett says that the architect who was employed as agent and superintendent of the plaintiffs in the construction of said building, immediately after the construction work was begun, commenced a course of unfair and unjust and arbitrary action with regard to the work to be done, and without authority, but with the intent to cause the defendant to abandon said work, demanded that said defendant should on many occasions tear down and destroy work already done by defendant; said work having been done and performed in accordance with said plans and specifications. That plaintiffs and their said architect and agent directed and attempted to compel this defendant to deviate from the plans and specifications of said building and so change the building as to cost the defendant a much greater sum than the same would have cost had said plans been followed, and, after having said plans changed, would not then allow the defendant pay for said change and extra work. That on account of the action of plaintiffs, their agent and employés, this defendant was compelled to abandon said contract, and that, if said building was ever completed at an expense greater than that promised to defendant, then all said extra cost and expense was the result of the many changes made in said plans and specifications. Wherefore defendant prays that he go hence without day and recover from plaintiffs his cost."

It will be perceived from the allegations in the answer of the contractor that it is very indefinite, especially as to the extra work or changes in the contract and as to the work torn down and destroyed. The sureties on the contractor's bond did not plead these acts on the part of the architect and the building committee as acts which breached the contract and justified the abandonment of the contract on the part of the contractor, but did allege that without their knowledge or consent the architect and appellees made numerous changes in the plans and specifications; "that the building under the amended plans and specifications was greatly enlarged; that stone trimmings were directed and caused to be used, which were not provided for in the plans and specifications; that a different brick was used, but a much more expensive brick than that provided for in the plans and specifications; that said brick was lain in a different mortar and in a different manner from that provided in the plans and specifications, which was much more expensive; that plaintiffs, acting through their architect, and acting for themselves, made such changes in the plans and specifications and in the construction of said building as to create a different contract and cause the construction of another and different building," etc.; which changes they plead as a release of their obligation under the bond.

[1, 2] By a counter proposition, appellee contends that as the sureties did not plead the acts of the architect and appellees, causing the work to be torn down and changes to be made as justifying an abandonment of the contract or building, and as they alone are appealing, they cannot complain that the issues were not submitted in the trial court; that as to the sureties, they having failed to plead the issue, there was no error in the refusal of the charge. We think any plea by the principal of the bond, if established, which would release him, will also release the sureties and will inure to their benefit, whether urged by them or not in a separate plea. Under articles 1842 and 1897, judgment cannot be rendered against parties secondarily liable where no judgment is rendered against the primary obligor. If the primary obligor is not liable, the surety would be released upon establishing that fact. It occurs to us that, when the principal and sureties are sued in the same action upon the same contract, if the principal pleads facts showing nonliability which would defeat a judgment against him, whether pleaded by the sureties or not, they could urge, both in the court below and upon appeal, such nonliability under the plea made by the principal. Wills v. Tyer, 186 S. W. 862, and authorities cited; Wandelohr v. Grayson County Nat. Bank, 102 Tex. 20, 108 S. W. 1154, 112 S. W. 1046.

We think the court correctly refused to submit the first issue asking a finding whether the architect was unfair in his demands with regard to extra work required under the contract, and in allowance for such work. Under the specifications red brick were called for. It appears, however, that a mottled brick was used instead in the construction. The facts in this case show before the contract was signed up a representative of the brick concern from whom the brick were purchased by the contractor, who under the contract was to furnish all the material in the construction of the building, was present, and the order was then given for the brick. It appears also that the agent of the company selling the brick was called in and asked as to the price of the two kinds of brick, and that he then told the contractor he would sell the mottled brick for the same price as the red, or that they would be the same. He afterwards came in and told the parties he had made a bust as to the price, but that he would make his word good. The contractor, however, testified that the mottled brick cost $2.50 more per thousand than the red,

but he would not be sure as to that. He says he bought 50,000 mottled face brick, and that it cost him to make that change $125. He admits there was an agreement about it before the contract was signed, and he says when the brick man came back he said he would have to charge more than for the red brick, "and he said he would have to charge me $20 per thousand, and we had some agreement about it, but I do not know what it was—it was verbal." It is conclusive that under the agreement to change the brick the contractor ordered the brick before anything was done on the building, and no complaint was made on that account until this suit.

[3] It is also claimed by one Jim Marlin, who was a subcontractor on the brickwork, that Stuckey had him to raise the grade line in some places about 10 inches more than shown by the plan, which required from 6,000 to 8,000 more brick. It will be observed that there was no allegation, either by the contractor or the sureties, that there was any change in this particular. It is hard to tell just what Marlin means. He says:

"He (Stuckey) did not change his plans, but the number of brick that it took to get up to this grade that he gave us was 6,000 or 8,000. I built it according to plans and specifications the best I knew how. Raising the grade was included in it."

The contract stipulates that it was agreed by the parties thereto that the work should be done under the supervision and direction of the architect, "and his decision as to the true construction and meaning of the drawings and specifications shall be final." In the specifications it is provided:

"In the event of any doubt or question arising respecting the true intent and meaning of the drawing or the specification or in regard to the fitness of material or labor, reference shall be made to the architect whose decision thereon shall be final and conclusive."

Again it is provided, if there was error or inconsistencies in the drawings or specifications, it was made the duty of the contractor to call the attention of the architect thereto for the purpose of adjustment before proceeding with the work. As to the grade, Stuckey says the floor line was three feet, six inches above the grade; that as the work was done it was according to the plans and specifications and upon his interpretation of the plans. The plans are not in this record. It appears no complaint was then made, either by the contractor or the subcontractor, but the interpretation of the plan by the architect was accepted, and there is no charge, either in the pleadings or evidence, that he fraudulently or unjustly interpreted the plans. The specifications referred to the plans for the thickness of all walls, and, other than Marlin's evidence, we find nothing showing any departure in height from the grade line. He does not state the height from the grade line the plans called for or the height of the work as actually constructed. He

gives nothing but his opinion or his interpretation of the plans. His interpretation could not control under the contract. If the architect is to be charged with arbitrarily fixing the height from the grade line, the plans for fixing it should be shown and the height from the grade which he required the walls to be constructed. The mere interpretation of a subcontractor ought not to be sufficient to rebut the interpretation of the architect when the contract makes the judgment or construction of the plans by the architect final. Kettler v. O'Neil, 57 Tex. Civ. App. 568, 122 S. W. 900; Buchanan v. Gibbs, 156 S. W. 914.

The next change urged was in the mortar. The specifications call for mortar to be white. It was agreed, upon the direction of the architect, doubtless to correspond with the change in the brick; the building committee agreeing to pay for the coloring matter, which they afterwards did. The mixing of the color is admitted by the witnesses to have amounted to but a small sum, and the work in doing so was immaterial.

The next change claimed is from a trowel joint called for in the specifications to a rake-out joint. This change was agreed to by the parties, and the difference in the cost of doing the work agreed upon. It was agreed that the rake-out joint should be paid for at $2 per thousand more than the trowel joint, which the committee paid, and the contractor accepted 80 per cent. thereof, up to the time of his abandonment of the work.

Next it is contended that there was a stone belt placed in the building which was not called for by the contract. This was agreed to and placed in the building, the only dispute being that the architect thought $74 sufficient for this work and the contractor thought he ought to have $87.50. The architect and contractor could not agree as to the price, and the architect then told him that they would have to arbitrate the matter under a clause of the contract authorizing arbitration upon such disagreement. To obviate the necessity of arbitration, the appellees agreed to pay for the work at the contractor's price, and did so.

[4] The next was a change in an excavation for the front steps, which is shown to have cost at most $17. This appears to have been credited by the architect after the contractor abandoned the building, and for which the architect gave him credit in his final certificate. The architect and appellees did not compel the contractor to deviate from the plans and specifications and did not refuse to allow him anything for it, as alleged in the answer; but, on the contrary, the evidence shows he agreed to every change and received pay for the extra work and material, unless it be for the brick that went into the building. These he bought or contracted for before he ever signed the contract or did the

work. The jury could not have found any of these things as a just cause or an excuse for abandoning the work by the contractor.

[5, 6] The second issue upon which a finding was required is whether the architect was unfair, and arbitrarily demanded and required the removal of completed work on the building. In general terms both Marlin, the subcontractor, and Garrett, the contractor, testified that they quit the building because they could not work under Stuckey as the architect; that he required them to pull down work which they had constructed according to the contract and specifications, and after he had inspected and passed it; that his conduct in the matter was such that they lost money and could not work under him. But, when called upon to specify what work was pulled down, they specified only two pieces of the work on two different occasions, and, as we gather from the evidence, the mortar used in laying the brick was given as the reason for condemning the work by the architect. Marlin testified that Stuckey made him tear out 8,000 or 10,000 brick.

"His objection was that some of them were crooked, and he said there was something the matter with the mortar; said it did not come up to specifications. The mortar called for in the specification was not used, it was changed. The mortar as used in the construction of the building was not the mortar described in the original specification."

On cross-examination he said:

"After reading the specifications in regard to the mortar, I see there was no change made in it, except color; it did not take much to put that in."

Mr. McLain, a witness for appellant, who worked under Marlin, when part of the work was torn down, which he did, and part ordered torn down, which he did not do, testified:

"Stuckey said the reason he wanted the brickwork torn out was because the mortar was not as good as it should have been. I do not know whether it was as good as it should have been or not; I am not an expert on that."

He further testified:

"I could detect that Stuckey was drinking while I was at work there; he drank frequently. Maybe he would be sober at such times when he would order the work taken out. He would approve the work when drinking. I had been engaged in putting in these brick which Stuckey ordered taken out."

This witness further states the brick were laid as good as they could considering the character of the brick. "The trouble with them was they were crooked." He further stated, with reference to drinking with Stuckey:

"Sometimes we would be pretty full when we laid brick in this wall that I have been talking about. That is not what made it rough."

A. M. Garrett, the contractor, was unwilling to testify that Stuckey made him tear out work done in accordance with the plans and specifications, because he said he was not an interpreter of them and did not think he was sufficiently of an expert. He did not know whether material used was according to the specifications, only that the specifications called for white mortar and that used was colored.

Obie Tidmore, who mixed the mortar, testified that about two weeks before Garrett quit Garrett told him, when he complained about the lime not being properly slacked, that Stuckey was gone and to go ahead and put it in. Garrett testified that if he told the witness such he did not remember. Stuckey testified on this question:

"There was one place there that I had passed on that I found the mud was bad and that caused me to go round the building, and I found that the mud was no account and not according to the plans and specifications in regard to the mortar, and I had to have it torn out. That on the south side I agreed to let stay in there when they promised me that they would see that the balance was according to the plans and specifications."

In accordance with Stuckey's direction, the work condemned by him was torn out and rebuilt by the contractor, and not until after this did Garrett abandon the work. True, he testified that a day or so before he left he notified one or two of the building committee that either he or Stuckey would have to quit. The specifications required all mortar to be made from Austin white lime or its equal. "Use one barrel of lime to each measure yard of same and gauging the same as it is used with 10 per cent. of Portland cement, the lime to be slacked at least six days before it is used." Also, stipulating further specifications in its use. By the terms of the contract it was agreed that the work on the building should be done under the direction of Stuckey as architect, and that his decision as to the true construction and meaning of the drawings and specifications should be final. The contractor was to provide safe and proper facilities at all times for the inspection of the work by the architect and, after receiving written notice from the architect, remove from the grounds or building all material condemned by him, whether worked or unworked; "and to take down all portions of the work which the architect shall, by like written notice, condemn as unsound or improper or in any way failing to conform to the drawings and specifications, and shall make good all work damaged or destroyed thereby." In the contract the contractor agreed to provide all material and work and to erect to full completion a brick veneer church, and to erect it as shown by the drawings and specifications prepared by Stuckey, which were made a part of the contract and identified by mark. The specifications also stipulated in any dispute arising as to the quality or fitness of the material or workmanship the decision shall strictly rest with the architect; that all material and workmanship of unsound or unfit character, or work or material which may become damaged after they are placed in the building, shall be immediately removed and reconstructed or refinished by the contractor

to the satisfaction of the architect; the expense, etc., to be borne by the contractor. Under the contract and specifications Garrett was to erect to full completion the church under the supervision of Stuckey, giving him the power to condemn the material or work, whether placed in the building or not, and to remove the same from the building when condemned. The only work shown to have been required by the architect to be removed was some brickwork, and this was occasioned by defective mortar, which was not according to specifications as declared by the architect. While the contractor and Marlin state in general terms the work was done as called for in the specification, they yet each show it was condemned on account of the mortar, and not one of them, when called to answer to the quality of the mortar, pretends that it was such as called for. Marlin appears to excuse himself for not following the specifications as to the mortar on the ground that by subsequent agreement the mortar stipulated for was changed, but on the cross-examination admitted when he then examined the specifications that the agreed change affected nothing but its coloring. . He nowhere says the mortar was according to the specifications, but says it was not so. Garrett and McLain disclaim any knowledge as to the mortar and refuse to testify it was according to specifications.

One witness says the lime was not slacked as required, and, when Garrett's attention was called to this fact, he told him Stuckey was gone and to go ahead and put it in. Garrett does not deny this, but says he does not remember it. Stuckey says positively it was not according to specifications, and he therefore required the wall to be torn down, and some of the committee also testified to the defective mortar. His act in causing the removal of the wall was prima facie evidence or conclusive that he did so properly under the powers granted him by the contract and specifications. When no witness swears that the mortar was according to the specifications, and all the evidence shows the order was given because of the mortar, and all the evidence given on that point shows that the mortar was defective, and not in accordance with the specifications, it occurs to us the jury would have had no evidence upon which to base a finding that Stuckey was unjust or arbitrary in directing its removal. It will be observed in the answer that Stuckey is treated as the agent of the committee and that his conduct induced the contractor to abandon the work. In other words, by the conduct of appellees' agent the contractor could treat that as a breach of the contract or a renunciation of the contract, which would justify him in accepting the renunciation as a breach, and that he could abandon the contract on such ground. In some sense it may be true that Stuckey was the agent of the building committee. By the contract,

however, the contractor agreed to complete the building under the superintendency of the architect, and to accept his judgment and to satisfy him as to work and material and follow his directions with reference to removing the work or material condemned by him. He so undertook to construct and complete the building. There is no collusion alleged or proven between Stuckey and the building committee.

[7] In the particular matter the judgment of Stuckey, under the terms of the contract, bound both parties, and there was no more reason why the committee should be held responsible for a defective judgment given by Stuckey than the contractor. The fact that the contractor accepted Stuckey signified he was willing to accept his judgment and to complete the building under his direction, and so the committee agreed to accept and abide by it. Lonergan v. San Antonio, etc., 101 Tex. 63, 104 S. W. 1061, 106 S. W. 876, 22 L. R. A. (N. S.) 364, 130 Am. St. Rep. 803.

[8-10] If there was fraud and collusion between the architect and the committee in the particulars complained of, the contractor could doubtless have abandoned the contract, but in this case there is none alleged or proven. We do not understand the mere rendition of a defective judgment by the selected arbitrator would justify an abandonment. Dallas, etc., v. Thomas, 36 Tex. Civ. App. 268, 81 S. W. 1041; Kilgore v. Northwest Educational Society, 89 Tex. 465, 35 S. W. 145; Kettler v. O'Neil, 57 Tex. Civ. App. 568, 122 S. W. 900; Jones v. Risley, 91 Tex. 7, 32 S. W. 1027; Railway v. Henry, 65 Tex. 686; Wright v. Meyer, 25 S. W. 1122. It appears from the record that the contractor obeyed the direction of the architect and took down the condemned work and rebuilt it. If this was an arbitrary direction or unjust on the part of the architect, and could be imputed to the committee under the contract, the contractor should have then declined or refused to comply, and if insisted upon should have abandoned the work, and treated such act as a renunciation on the part of the committee; but having accepted the judgment of the architect and having complied with his request, it appears to us he elected to continue under the contract or waive his right to treat it as a breach. He may have been entitled, after complying with the directions, to recover damages by reason of such arbitrary acts; but after acquiescence he could not base thereon his defense to the charge of a subsequent abandonment. In this case no damages are claimed by the alleged arbitrary acts and no issue requiring a finding thereon. All that is claimed for these acts is that it justified the contractor in abandoning the building. This assignment will be overruled.

[11] The second assignment is overruled for the reasons above stated, and because it was a general charge, instructing a verdict for

defendant, if the jury should find there was unjust and arbitrary interpretation of the plans by the architect. The case having been submitted on special issues, it would have been improper to have given the general charge requested, if otherwise correct.

The third assignment asserts error in the rendition of a judgment for any sum in excess of $2,840.21, because the jury did not intend to find for more. The first special issue is:

"What amount of money was reasonable and necessary for the church to expend, if expended with reasonable economy, to complete the church building according to plans and specifications after the contractor had gone away?"

The jury answered: "$7,000." The jury found that the contractor received full compensation for all changes, alterations, or additions not required by the plans and specifications made at the request of the supervising architect, or for any additional costs owing to the change of brick. This finding is amply supported by the evidence. The architect made out an account and statement, which shows that the contractor received credit and was paid for all additional work or extra work; in fact, Garrett admits that he received pay for all additional work as agreed upon. His only contention is that he did not get enough, or what the work was worth. He agreed to the change in the brick before he signed the contract and before he altered it, and never put in a claim or made any for the difference in the brick, if there was any. There appears to be a contention that a basement, with furnace, was put in the building after Garrett quit, which is charged to him. The account and report shows this is not true; none of it was charged to him. The debits and credits show wherever there was a charge for any of it there was a proper credit made. The item sued for in this case for 78 days, for which liquidated damages were claimed, $390, the insurance for $188, paid by the committee, and the account of the New Decatur Cornice & Roofing Company, $735, are not charged in the account of the architect further than is shown by the certificate of the architect on the estimate given by him on the last item. Stuckey also testified that the account of the Decatur Roofing Company was not included in his account, as made out. The facts are, as we gather from the record, that the material furnished by the company was shipped to Garrett before he left, and placed on the ground. The committee paid him 80 per cent. thereof upon the estimate given by the architect. He then sent his check to the company for $500; but before it could be returned to the bank for payment he drew out all his money and left, and it was not paid because he had no funds in the bank to cover the check when presented. The item of $300 to repair a defective roof does not enter into the account for work done by the committee after Garrett quit. The account as set out item by item which makes up the costs of the work necessary to complete the building, according to the aggregate footing made by the architect, amounts to $7,275.63. Some of these items are not properly chargeable to the contractor and which are in the above total, as, for instance, $2 per thousand for laying 60,000 brick, with rake-out joints, $120, and some other items not necessary to mention; but the account shows that these items, with others, such as the sums received from the sale of material and the like, left over after completing the building, were charged back by giving the account credit, the total of which is $634.59, which would leave the net amount the committee expended to complete the building according to the plans and specifications, $6,641.04. This, together with $8,976.94, paid the contractor upon certificates, left him due $3,140.21, over and above the contract price of $12,477.77, for which item the judgment was rendered and for which sum the committee sued in their petition. The jury found $7,000 necessary to complete the building according to plans and specifications. They evidently did not take into consideration the proceeds from the sale of material which the committee had on hand after the completion of the building and for which the contractor was given credit by the architect and the committee. It is also equally manifest in reaching their conclusion they did not include in their findings the $735 due the Decatur Cornice Company, the $390 liquidated damages, the $188 for insurance, or the $300 costs or damage on account of repairing the roof of the building, which were sued for as separate items by plaintiffs in their petition.

[12-14] Taking the findings of the jury, $7,000 and the sum paid the contractor, $8,976.94, without giving credit for the material sold, would amount to $15,976.94, the entire cost of the building, which exceeds the contract price and is more than was claimed or judgment entered for by about $460. The judgment on this item could not be for more than that claimed in the petition, and the judgment was, accordingly, so rendered. It is true as a rule, that the judgment must be based upon the verdict; but where the verdict is excessive a remittitur may be filed, and we see no material error in rendering the judgment for the amount authorized without formally entering a judgment and then filing a remittitur. We have heretofore substantially so held. Texas Building Co. v. Reed, 169 S. W. 211. The jury's verdict is substantially correct in finding that it took $7,000 to complete the building according to the plans and specifications. They were not required by the issue to find what sum the material left on the ground brought after the completion of the building, and the court could properly do so. It is evident, from a consideration of the pleadings in this case and the undisputed facts, that the

court would not have been authorized to render a judgment for $2,840.21 in entire settlement of all the issues raised by the pleadings. The only issue submitted to the jury as to the committee's claim was the one set out. The court evidently found and reserved for his finding, on the other items, that is, the $188 on insurance, $290 liquidated damages, and he found nothing for the item of $300 for repair of roof. He found $3,140.21 was paid by the committee to complete the building over and above the contract price, according to the plans and specifications. We believe no material error is shown by this assignment. The second proposition contends that $300 was included in his item for repairing the roof. This is not shown, either by the verdict, judgment, or in the architect's statement and account of the necessary expenses paid to complete the building according to the plans and specifications. The judgment itself itemized the several amounts for which recovery was allowed and given, and the $300 is not one of them.

[15] The fourth and fifth assignments present the propositions that the court should have deducted the amount received by the intervener from the judgment rendered in favor of the committee, and erred in rendering judgment in favor of the intervener against the appellant sureties. It is insisted that the judgment in this particular was a double recovery and should be reduced by that amount, which is $752.66, with interest to the date of the judgment, $44.54. As stated under the third assignment, this item was not charged to the contractor in the items of costs necessary to complete the building after the committee took charge, as is clearly shown by a careful investigation of that account, as well as from the testimony of the architect who made it. All that can be said is the material making up this account was on the ground when the contractor abandoned the work, and the committee used it in the building, in completing the work. It is uncontroverted that the committee paid the contractor 80 per cent. for the material before he left, but, instead of applying that amount upon the bill of the interveners, he drew it out and left the bank without funds to pay his check to intervener, and also left town. Certainly, if the contractor never paid for this material and he got credit for it in the bill, he should pay either the committee or the company from whom he purchased it. Having purchased it before he left, it was not properly chargeable to the committee as costs expended by them in completing the building. They had 80 per cent. thereof before he left and should not be charged again for that amount. The remaining 20 per cent. they will be liable for to the company furnishing it, if that company insists upon it, or to the contractor. The parties interveners and plaintiffs, as well as the court, treated this entire debt as due from the contractor to the intervener. It can make no

difference to the contractor whether the building committee procured judgment on this item or the intervener. He was due that bill and never paid it. It is not charged to him by the committee as part of the costs in completing the building. He is charged with 80 per cent. received by him before he left, which was evidenced by the architect's certificate and went to make up the total of the items which had been paid him before abandoning the work. The intervener appears to be satisfied to release the committee for the 20 per cent. used by them which they had not paid, and this cannot injure the contractor or his bondsmen. It is manifest from the entire record there was no double recovery and no injury done the appellants.

[16-18] The sixth assignment is the court erred in rendering judgment for $188 for insurance paid by the committee after he abandoned the work because the committee took over and completed the building and because there is no finding by the jury for a recovery. This issue was not submitted to the jury, but the court in his judgment makes a specific finding for the item and rendered judgment therefor. This the court may do without a finding by the jury when the issue is not submitted to the jury and none requested if there is evidence in the record supporting the finding. The evidence shows the committee paid for the insurance after they took charge, and it is sufficient to show that the contractor did not during that period. The contract states the contractor shall, during the progress of the work, maintain insurance on said work in his own name and in the name of the owners against loss by fire, lightning, cyclone, or other casualties, the policy to cover all work incorporated in the building and all material. The contract obligated him to carry liability insurance from the beginning of the building operations until its completion. These obligations on the part of the contractor the court found, upon sufficient evidence, were breached by the contractor. This he and his sureties are liable for, and we think the court properly rendered judgment therefor. When the sureties executed bond that the contractor shall faithfully perform his contract and he abandons it before completing the building, and the owner completes at extra cost, he is entitled to judgment on the bond. Texas Fidelity & Bonding Co. v. Rosenberg, etc., 195 S. W. 298; Texas Fidelity & Bonding Co. v. Elliott, 195 S. W. 301; General Bonding, etc., Ins. Co. v. Hill, 195 S. W. 873; Da Moth & Rose v. Hillsboro, etc., 186 S. W. 437.

[19] The seventh assignment is as follows:

"The court erred in entering judgment in favor of plaintiff for $5 per day for 78 days' delay in completing the building, because there is no evidence of unnecessary delay in completing the building, nor is there evidence that $5 per day would be a reasonable amount of compensation."

Under this assignment appellants present propositions: (1) Stipulations for damages

for failure to perform a contract in a specified time is based on actual damages that may occur. There being no evidence of damages, there is nothing to base a recovery for liquidated damages. (2) Stipulations greatly disproportionate to actual damages sustained will be construed as a penalty, regardless of the language used. (3) The contractor having abandoned his contract within the time specified in the contract on account of the wrongful conduct of the architect, the contract was abrogated before the penalty for liquidated damages accrued. The contractor was only liable for the amount of the reasonable cost for completion. (4) There is no evidence to support the judgment for the reason there is no attempt to fix the responsibility for the delay, whether by the contractor or the architect, or the architect and the building committee, after abandonment. The last two propositions we do not think are relevant to the assignment and not germane thereto. The assignment raises simply a question of law and a proper interpretation of the contract. The jury found that 78 days were reasonably necessary to complete the building after the 10th day of February, 1916, the time under the contract when it should have been completed. The contractor quit work on the 5th day of February, 1916. The architect gave the owners notice, and they took charge February 14, 1916, and the building was completed June 29, 1916, 139 days after the time in which it should have been completed. By the ninth paragraph of the contract time is made the essence thereof, and, in the event the contractor fails in the due performance of the entire work to be performed by and at the time stipulated, he should pay the committee "as and for liquidated damages and not as a penalty the sum of $——— for each and every day the said party of the first part shall be in default, which said sum of $5.00 per day, in view of the difficulty of estimating such damages with exactness, it hereby expressly fixed, estimated, computed, determined and agreed upon as the damages which will be suffered by the party of the second part by reason of such default, and it is understood and agreed to by the parties to this contract that the liquidated damages herein mentioned are in lieu of the actual damages arising from such breach of this contract; which said sum the said party of the second part shall have the right to deduct from any monies in its hands otherwise due or to become due to the said party of the first part, or to sue for and recover compensation or damages for the nonperformance of his contract, at the time or times herein stipulated or provided for." The bond executed by the appellee recited that Garrett had entered into a contract with the building committee to construct and complete the church, "in accordance with the contract, plans and specifications" drawn by Stuckey, and which are fully set out in said contract and specifica-

tions and plans, and provides they "shall be and is hereby declared to be part of this bond to complete said building and improvements in a good, substantial workmanlike manner, to be approved by R. H. Stuckey, architect. Said building to be completed within four and one half months from September 25, 1915, strictly in accordance with the plans and specifications." The condition of the bond is:

"The said A. M. Garrett shall well and truly do and perform all and every the covenants and conditions as set forth in said contract, plans and specifications, as drawn by the architect and agreed to be performed by him, kept and carried out in accordance with said contract, plans and specifications."

The testimony of Stuckey warrants the finding that only about 40 or 50 per cent. of the work on the building and in the construction had been done up to the time the contractor left. He testifies that there were 117 days' overtime in its completion, less an allowance of 39 days for bad weather, etc. The contract also provides for an extension of time on account of fire, lightning, cyclone, or other casualty, and by strikes or lockouts by employés, which extension was to be fixed by the architect, but no allowance was to be made unless requested in writing to the architect. The specifications also provided that where work or material was condemned "no extension of time shall be allowed for reconstruction of faulty work." It is our opinion that the clause set out in the contract will authorize the recovery of the stipulated demand for delay occasioned by the contractor's breach by abandoning the contract and forcing the committee to take charge, and complete the building. The parties agreed the liquidated damages were in lieu of actual damages in view of the difficulty of estimating such damages with exactness. In Collier v. Betterton, 87 Tex. 440, 29 S. W. 467, cited by appellants, the Supreme Court says:

"If the damages be in their very nature uncertain or the amount indeterminate, the sum specified will be treated as fixing, by stipulation, the amount of the recovery. But the difficulty arises in cases in which the damages are reasonably capable of ascertainment. There, as we think, the authorites leave us at sea without any accurate chart to direct our course. It would seem that if the expressed intention of the parties to a contract should govern in every case, when they say that a certain sum shall be paid as liquidated damages in case of its breach, it should be construed as fixing the amount of a recovery."

It would, it seems to us, be assuming too much on our part to hold that for the delay "the damages are reasonably capable of ascertainment," when the parties to the contract agreed to the stipulation on the ground that it was difficult to estimate such damages, especially where the record shows no effort was made to prove that the damages were reasonably capable of ascertainment. In the Collier Case the Supreme Court refused a writ of error, but in doing so took occasion to discuss the question of liquidated

damages and quoted what the Court of Appeals had said by way of general rule. That court in the case said:

"Under such a construction there was not proof of damages to the extent of the recovery, and the appellant suffered no injury from the charge as given."

It seems to us the purpose of the Supreme Court was to guard this general statement of the rule by the Court of Civil Appeals. Our view of this matter we regard as supported by the Supreme Court in Indianola v. Railway Co., 56 Tex. 606-608; Yetter v. Hudson, 57 Tex. 604. See, also, the recent cases of Miller v. Chicago Portrait Co., 195 S. W. 619; Texas Fidelity & Bonding Co. v. Elliott, 195 S. W. 301; Texas Fidelity Co. v. Rosenberg Co., 195 S. W. 298. This court has heretofore substantially so held in the case of Walsh v. M. E. Church, 173 S. W. 243. The Supreme Court, however, has granted a writ of error in that case and could have done so, as we conceive it, upon no other ground than that our holding upon that question was incorrect. We nevertheless think the holding therein supported by authority. At this time we desire to say that in that case we did not hold, as appellants seem to think, that a surety in no event would be liable for liquidated demand where the contractor abandons the contract and the owner takes charge of the building. The holding there made was with reference to the express stipulation of the surety limiting its liability on the bond, to the effect that it should have notice immediately of any default upon the part of the contractor which in that case was not given as required, and hence we held the surety could not be charged with the delay under the terms of the contract of suretyship.

[20, 21] It is contended by propositions 3 and 4 that the evidence will not warrant the judgment for the delay. These propositions we do not believe relevant to the assignment, and we cannot properly consider them. However, the trial court was warranted in finding that the committee or the architect were not guilty of any such wrong as would justify the contractor in abandoning the contract. Germain v. Stanton, 158 Mich. 214, 122 N. W. 524, 123 N. W. 798. We do think it is made to appear that delay was occasioned by any cause which authorized an extension of time, or at least the court was justified in so finding. Certainly the contractor showed no written request for extension of time, as required by the contract. We think also the verdict of the jury is supported by the evidence to the effect that 78 days was reasonably necessary to complete the building after the committee took charge. We think also the court was justified in finding that the changes as to the mortar, stone belt, excavation for the steps, etc., did not delay the contractor or the committee in the work. We therefore overrule the assignment.

[22] The eighth assignment asserts it was error to render judgment against appellant sureties, because the uncontroverted evidence is that numerous changes were made in the plans and specifications, and the contractor was required by appellees to make numerous changes in the construction of the building, and that no notice was given to the sureties. The sureties, it may be conceded, did not receive notice of the changes. The changes have been set out under the first assignment heretofore considered. The furnace room added by the committee had nothing to do with the contract, but was an independent undertaking by the committee which could in no way have affected the contract, unless, after they took charge some of the employés on the building were used for that purpose. The coloring in the mortar, the rake-out joints, instead of trowel joints, the stone belt, and the excavation for the steps, we think the court, under the evidence, would be justified in finding were not such material alterations as to change the identity of the building or the work, or to materially affect the contract. As to the different colored brick, from red to speckled brick, we think the court had ample evidence to find that the cost of speckled brick was no more than the cost of the red brick; and, as to Marlin's claim that the grade line was ten inches higher than the plans called for, the court had ample evidence to find that this was not true and that the building was erected according to the plans as to the grade. Besides these, the contract authorized the making of changes under the direction of the architect and for the payment of the same by the committee. This the architect did authorize and the committee paid therefor. The contract and specifications were made part of the bond. We do not believe under the rules we would be justified in holding the sureties released because of these changes. Da Moth & Rose v. Hillsboro, etc., 186 S. W. 437, and also authorities cited under the seventh assignment; American & Eng. Enc. of Law, (2d Ed.) vol. 27, 494, 495; Cyc. vol. 32, p. 188.

The Thirty-Fourth Legislature, Acts of 1915, General Laws, pp. 223, 224, amended article 5623, and added article 5623a to Revised Civil Statutes. The added article provides that the owner of a building to be erected shall take out a good and sufficient bond, giving the owner, materialmen, and laborers a right of action thereon, and it further provides:

"No change or alteration in the plans, building, construction or method of payment, shall in any way avoid or affect the liability on said bond, and the sureties on said bond shall be limited to such defenses only as the principal on said bond could make."

This law was in force when the contract in question was executed. In addition to the general observation made by us, we believe this law precludes the defense set up in this case under the facts, as shown by the record.

The judgment will be affirmed.